852 P.2d 1376

Doug SCOTT and Katie Scott, doing business as West Valley Bus Company, Plaintiffs–Appellants–Cross Respondents,

v.

BUHL JOINT SCHOOL DISTRICT NO. 412; Buhl Joint School District Board of Trustees; Leonard Crismor, Armand Eckert, Lee Popplewell, Dr. Dan Nofziger, and Mary Lou Pierce, in their capacity as trustees of the Buhl Joint School District No. 412; and Eugene Pyles, in his capacity as superintendent of the Buhl Joint School District No. 412; and Mayflower Contract Services, Inc., an Indiana Corporation, Defendants–Respondents–Cross Appellants.

No. 20173.

Supreme Court of Idaho, Boise, March 1993 Term.

May 19, 1993.

Green Law Offices, Ctd., Boise, for respondent school districts. Cumer L. Green argued.

Hawley, Troxell, Ennis & Hawley, Boise, for respondent Mayflower. Merlyn W. Clark argued.

McDEVITT, Chief Justice.

## STATEMENT OF FACTS

In March of 1992, Buhl advertised for bids for a pupil transportation contract, pursuant to I.C. § 33–1510. The Scotts submitted the only bid, totalling $453,-565.96. Buhl rejected this bid, and it readvertised for bids. In its bid solicitation, Buhl reserved the right to "accept or reject or to select any portion thereof any or all bids and to waive any technicality." Further, the bid form provided by Buhl had separate lines for bids for each transportation route. Mayflower submitted a bid for $392,111.07, and the Scotts submitted a bid for $404,078.76. Mayflower conditioned its bid "upon the award of all school bus routes to Mayflower Contract Services." Although Mayflower's overall bid was lower than the Scotts' bid, the Scotts bid lower on four transportation routes, routes 9, 10, 13, and 14. Buhl awarded the pupil transportation contract to Mayflower.

## PRIOR PROCEEDINGS

A. *The Summary Judgment:*

On June 8, 1992, the Scotts filed a complaint against Buhl and Mayflower. In their complaint, the Scotts listed five causes of action: (1) for a declaratory judgment declaring the bidding process to be invalid; (2) for an injunction to stop the respondents from proceeding with the contract, or, in the alternative, to award the contract to West Valley; (3) for mandamus, awarding the contract to West Valley, or, in the alternative, to relet the bid; (4) for violation of statutory duties pursuant to I.C. § 33–1510; and (5) for violation of 42 U.S.C. § 1983. The Scotts also asked for attorney fees under the private attorney general doctrine and 42 U.S.C. § 1988.

Elam, Burke & Boyd, Boise, for appellants. Peter C.K. Marshall argued.

On June 12, 1992, Buhl filed an answer to the Scotts' complaint. Among other things, Buhl responded that it did not have sufficient information regarding the Scotts' allegation of taxpayer standing[1], and that it had reserved the right to accept or reject any portion of a bid. Buhl requested a dismissal with prejudice and attorney fees and costs. Mayflower filed its answer on June 24, 1992, and it denied the Scotts' allegation of taxpayer standing.

On June 29, 1992, Mayflower filed motions to dismiss for lack of standing and for summary judgment. In its motion for summary judgment, Mayflower requested that the court rule, as a matter of law, that it was appropriate for Buhl to reject all bids, that it was within Buhl's discretion to accept Mayflower's bid, notwithstanding any irregularities, and that all claims be dismissed. Buhl and the Scotts also filed motions for summary judgment on the same day.

On July 20, 1992, the court issued its opinion and order regarding the cross-motions for summary judgment and Mayflower's motion to dismiss for lack of standing. The court granted respondents' motions for summary judgment and Mayflower's motion to dismiss for lack of standing. Regarding taxpayer standing, the court identified a two-prong inquiry:

> [I]n order for the plaintiffs to have standing in this case as taxpayers, they must demonstrate a right to relief under either of the following scenarios. [scenario 1] The plaintiffs must set forth sufficient evidence of an injury in fact, uncommon to other similarly situated taxpayers, wherein they would acquire a personal stake in the outcome of this controversy, *Greer v. Lewiston Golf & Country Club, Inc.*, 81 Idaho 393, 397, 342 P.2d 719, 722 (1959); or [scenario 2], in the alternative, they must show that the School District and Mayflower engaged in an illegal act of such a nature as to "imperil the public interest or work

public injury." *Pflueger v. City and County of Honolulu*, 5 Hawaii App. 13, 15, 674 P.2d 1019, 1021 (1984); *Iuli v. Fasi*, 62 Hawaii 180, 184, 613 P.2d 653, 656 (1980).

As to scenario 1, the court concluded that the Scotts did not have taxpayer standing because they did "not suffer an injury that is not common to other similarly situated taxpayers." The court reasoned that, like all taxpayers, the Scotts actually benefitted from Buhl awarding the contract at a lower price.

As to scenario 2, the court further divided its taxpayer standing analysis. First, the court analyzed whether Buhl engaged in illegal acts regarding the bidding process. "Illegal acts" would consist of Buhl's "circumvention of state statutes by proof of irregularities in the bidding process." In this respect, the court rejected the Scotts' argument that the specific language of I.C. § 33–1510 required that it be awarded the transportation contract after the submission of its first bid. The court reasoned that the Scotts' reading of the statute would destroy its "viability," ruling that "I.C. § 33–1510 must be 'construed with the primary purpose of best advancing the public interest,'" quoting *Platt Elec. Supply, Inc. v. City of Seattle*, 16 Wash. App. 265, 270, 555 P.2d 421, 426 (1976), *review denied*, 89 Wash.2d 1004 (1977), and that school districts have discretion to reject bids if they are not the best bargain for the tax dollar. In support, the court cited cases from other jurisdictions that dealt with "similar language as that found in I.C. § 33–1510." In conclusion, the court stated that "in the absence of fraud, collusion, favoritism, extravagance or corruption, the scale must [be] tipped in favor of the 'primary purpose' of giving the public the best bargain for its tax dollars."

Scenario 2, part 2, dealt with whether the bid specifications "undermined the object and integrity of the competitive bidding

---

1. In their complaint, the Scotts alleged:

> 2. Plaintiffs are taxpayers in Twin Falls County and pay taxes which support the Defendant Buhl Joint School District No. 412. Plaintiffs have suffered damages as taxpayers

as a result of the actions of the Defendants as set forth in this Complaint. Plaintiffs, as owners of West Valley Bus Company, have been injured by denial by Defendants of Plaintiffs' statutory and constitutional rights.

process, or that there was proof of favoritism," quoting *Unisys Corp. v. Department of Labor*, 220 Conn. 689, 693, 600 A.2d 1019, 1023 (1991). In this regard, the court ruled that the specific language in Buhl's bid proposal did not mandate that the bids be "stand-alone" bids or forbid "package" bids. Further, the court rejected the Scotts' argument that Buhl's prior practice of specifically requiring "stand-alone" bids weighed in favor of that interpretation where this current bid proposal did not contain that requirement.

The court also ruled that the Scotts did not have standing as "disappointed bidders," and it rejected their 42 U.S.C. § 1983 claim, ruling that "the Scotts had no protectable property interest in their bid."

The Scotts filed a motion for reconsideration, and the court issued its opinion and order on the Scotts' motion for reconsideration on July 29, 1992. On reconsideration, the Scotts argued that since their second bid was lower than Mayflower's bid regarding four particular bus routes, they should have been awarded the contract for those routes as the "lowest responsible bidder." The court rejected this argument, once again focusing upon the discretion of the board of trustees to select a bid that best fit the public interest.

On July 29, 1992, summary judgment was entered in favor of Buhl and Mayflower, and against the Scotts.

### B. *Respondents' Request For Attorney Fees And Costs:*

On July 24, 1992, Buhl filed a memorandum of costs and attorney fees. Buhl requested the court award it (1) costs as a matter of right in the amount of $33.00; (2) discretionary costs (including lodging, copying, long distance telephone charges, and telefax charges) in the amount of $1,049.94; and (3) attorney fees in the amount of $16,107.50, pursuant to I.C. § 12–120 and I.R.C.P. 54 because the lawsuit resulted from a commercial transaction. On July 28, 1992, Mayflower filed a memorandum of costs and claim for attorney fees. Mayflower requested the court to award it (1) costs as a matter of right in the amount of

$33.00; (2) discretionary costs (including the use of "Lexis," which is a computer service for legal research) in the amount of $249.87; and (3) attorney fees in the amount of $13,292.87.

On October 13, 1992, the court issued its opinion and order regarding respondents' requests for attorney fees and costs. The court awarded costs as a matter of right to both respondents. It denied attorney fees pursuant to I.C. §§ 12–120(3) and 12–121, finding that "the dispute between the Scotts and the defendants did not involve a commercial transaction integral to the Scotts' claim," citing *Brower v. E.I. DuPont DeNemours & Co.*, 117 Idaho 780, 792 P.2d 345 (1990), and *Idaho Newspaper Found. v. City of Cascade*, 117 Idaho 422, 788 P.2d 237 (Ct.App.1990), and that "the case involved legal matters that were complex and not easily resolved." Finally, the court denied the discretionary costs requested by Buhl and Mayflower because, while the costs were necessary, they were not exceptional, but merely "part and parcel of the overhead involved in prosecuting or defending a case in a modern law office."

### C. *Notices Of Appeal:*

On September 4, 1992, the Scotts filed a notice of appeal pursuant to I.A.R. 11(c)(1), appealing from the court's July 29, 1992 summary judgment. Buhl, on November 5, 1992, and Mayflower, on November 18, 1992, filed notices of cross-appeal, appealing from the court's October 13, 1992 order denying attorney fees and discretionary costs.

On appeal, the parties raise the following issues:

### ISSUES ON APPEAL

I. Did the district court err by ruling that Buhl properly accepted Mayflower's entire bid, even when the Scotts submitted a lower bid on four routes, and in ruling that Mayflower's bid was in proper form?

II. Did the district court err by ruling that the Scotts did not have a claim for relief under 42 U.S.C. § 1983?

III. Did the district court err by ruling that the Scotts lacked standing to bring this action?

IV. Are the Scotts entitled to attorney fees, both at the district court and appellate levels?

V. Are cross-appellants entitled to attorney fees pursuant to I.C. §§ 12–120(3) or 12–121?

### ANALYSIS

#### I.

The district court's decision that Buhl properly awarded the bid proposal to Mayflower was premised on its ruling that Buhl had *discretion* to award the bid proposal to a bidder. While we affirm the decision of the district court, we do so for other reasons.

■ We begin our analysis of issue I with a brief outline of the law applicable to the award of pupil transportation contracts. The relevant statute, I.C. § 33–1510, provides:

**33–1510. Contracts for transportation service.**—All contracts entered into by boards of trustees for the transportation of pupils *shall* be in writing in a form approved by the state superintendent of public instruction. No contract *shall* be executed covering a period of time exceeding five (5) years.

Before entering into such contracts, the board of trustees *shall* invite bids by once giving notice as provided in section 33–402, Idaho Code, and *shall* award the contract to the lowest responsible bidder.

(Emphasis added.) As our emphasis indicates, the statute speaks in mandatory terms. *See Goff v. H.J.H. Co.*, 95 Idaho 837, 839, 521 P.2d 661, 663 (1974) ("The word *shall*, when used in a statute, is mandatory." (emphasis in original)). This statute mandates that once bids are received by the board of trustees, it must award the contract to the lowest bidder unless the lowest bidder is not a "responsible" bidder.

If it is determined that the lowest bidder is not "responsible," this Court has explained:

If any such facts do exist, they must be weighed and considered by the ... board of trustees, while in session, and if the contract is let to another than the lowest bidder, the ultimate facts upon which that action is based should be entered in the clerk's minutes....

*Seysler v. Mowery*, 29 Idaho 412, 417, 160 P. 262, 263 (1916).

■ An examination of the bid form provided by Buhl, reveals that Buhl solicited "the following bids:"

A. Transportation of regular eligible pupils approximately 177 days per year to and from school as presented on map exhibits routes one (1) through fourteen (14) attached hereto.

.　　.　　.　　.　　.

B. Pre–School route (3 and 4 year olds): This bus operates a school year of 150 days, Monday thru [sic] Thursday each week with a driver and aide required. Between seven (7) and twelve (12) students were picked up during past year between 8:25 A.M. and 8:55 A.M. and delivered home between 11:15 A.M. and 11:45 A.M. Mileage is approximately 9 miles daily. Base Bid for 1991–92 school year was $67.89 per day. Final negotiation can be based on enrollment and mileage at the start of the school year.

.　　.　　.　　.　　.

C. Extracurricular Bid: All requirements set forth herein in the bid process for routes shall apply to extracurricular bus transportation. School District Policies as published shall also govern the conduct of passengers on field trips of any kind. Approximate annual mileage is 30,000 to 40,000 miles.

In addition, Bid A, regarding "regular eligible pupils," was governed by the following provision:

The School District, by and through its Board of Trustees, may alter or change any bus route(s) during the term of this Contract which change or modification may result in either the increase or decrease of total mileage per route. Any

increase or decrease in mileage on a single route of six (6) miles or less shall not result in a change in compensation paid for that route. Each mile decreased or increased above or below the six (6) miles figure indicated above shall result in a change in compensation paid for that route, which change shall be based upon the negotiated per mile figure.

In the bid form, the above-quoted Bid A was followed by blank lines for the bidder's daily annual bid on each of the fourteen routes, as well as a blank line for the total annual bid amount on all fourteen routes. The above-quoted Bid B, regarding the pre-school route, was followed by a blank line for a daily bid. The above-quoted Bid C, regarding the extracurricular routes, was followed by a blank line for a per mile bid.

The parties in this case focus upon certain language appearing several times in the bid proposal, this language being that Buhl reserved the right to accept or reject any bid or portions thereof.[2] The Scotts argue, essentially, that this language means that every blank line in the bid form constitutes a separate bid. The Scotts' construction of this language would result in Buhl being able to divide the fourteen routes under Bid A between different bidders. We disagree with the Scotts' reading of Buhl's reservation language. The reservation language applies to the three separate bids, *i.e.*, "the following bids," Bid A, Bid B, and Bid C. Thus, if Bidder 1 had submitted the lowest bid on Bid A, and Bidder 2 had submitted the lowest bid on Bid B, the reservation language would operate to allow Buhl to award Bid A to Bidder 1 and Bid B to Bidder 2, assuming, of course, that both bidders were "responsible" bidders. In the present case, Mayflower submitted lower bids than the Scotts on all three bids. Furthermore, Buhl found Mayflower, as well as the Scotts, to be "responsible" bidders. To succeed, the Scotts would require this Court to determine that Buhl invited separate bids on each route, 1 through 14. We cannot so construe the bid request. Therefore, Buhl properly awarded a contract for Bid A, Bid B, and Bid C to Mayflower.

## II.

The Scotts claim that the district court erred by denying their claim for relief under 42 U.S.C. § 1983.[3] The court rejected the Scotts' § 1983 claim because it found that they were not entitled to relief under § 1983 as disappointed bidders because they did not have a property interest in the award of the pupil transportation contract.

In order to have a protectable property interest under the Fourteenth Amendment to the Constitution of the United States, "a person ... must have more than a unilateral expectation of it. He [or she] must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709.

In *Seysler v. Mowery,* 29 Idaho 412, 160 P. 262 (1916), the Wallace, Idaho city council awarded a contract for paving

---

2. On page 1 of the bid proposal, "[t]he Board of Trustees reserve[d] the right to accept or reject or to select any portion thereof any or all bids...." On page 2 of the bid proposal, "[i]t is understood that the Board of Trustees reserves the right to reject any or all proposals...." On page 3 of the bid proposal, "[t]he Board of Trustees reserve[d] the right to accept or reject any and/or all bids, or portions thereof...." On page 9 of the bid proposal, "[t]he Board of Trustees reserve[d] the right to accept or reject any and/or all bids, or portions thereof...."

3. 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

streets and alleys to a company that had submitted the *highest* of six bids. Citizens and taxpayers of Wallace brought suit to enjoin the City of Wallace from entering into a contract with the high bidder. The governing statute provided that "[a]ll contracts ... shall be made with the lowest and best responsible bidder...." *Seysler,* 29 Idaho at 416, 160 P. at 263. This Court explained the purpose of competitive bidding statutes:

> It was manifestly the purpose of the Legislature, in enacting the [statutes], to procure competitive bidding for contracts for making public improvements of the kind here under consideration, and thereby to safeguard public funds and prevent favoritism, fraud and extravagance in their expenditure....

*Seysler,* 29 Idaho at 416–17, 160 P. at 263, recently quoted in *J & J Contractors/O.T. Davis Const., A.J.V. v. State,* 118 Idaho 535, 536, 797 P.2d 1383, 1384 (1990). We also stated that "a contract of the kind here proposed to be entered into must not be let to any other than the lowest bidder, unless some fact, or facts, exist by reason of which a bid, other than the lowest, has been made by one who is, even though higher in price, the best responsible bidder." *Seysler,* 29 Idaho at 417, 160 P. at 263. In addition, we quoted from *Faist v. City of Hoboken,* 72 N.J.L. 361, 363, 60 A. 1120, 1121 (1905):

> If a responsible bidder tenders [it]self ready to fulfill [its] bid by entering into the contract ... [it] is entitled to be awarded the contract as against any person whose bid was higher than [its].
>
> If there be an allegation that a bidder is not responsible, [that bidder] has a right to be heard upon that question, and there must be a distinct finding against [that bidder], upon proper facts, to justify it.

*Seysler,* 29 Idaho at 418, 160 P. at 263. Thus, it is clear that in Idaho, and under a competitive bidding statute providing for the award of the contract to the lowest responsible bidder, the lowest bidder has a property interest in the award of the contract. Further, in order to justifiably award the contract to a bidder other than

the lowest bidder, the governmental entity must afford the lowest bidder due process, *i.e.,* notice and an opportunity to be heard at a meaningful time.

■ In this case, Buhl, the district court, and this Court have all agreed that Mayflower was the lowest bidder. Furthermore, Buhl specifically found that Mayflower was a responsible bidder. Therefore, the Scotts did not have a property interest under Idaho law, and, thus, their claim under 42 U.S.C. § 1983 fails.

### III.

The Scotts claim that the district court erred in ruling that they did not have standing to bring this action. The district court ruled that the Scotts did not have standing as disappointed bidders or taxpayers.

We have explained:

> [A] citizen and taxpayer may not challenge a governmental enactment where the injury is one suffered alike by all citizens and taxpayers of the jurisdiction. In those situations the proper forum to reshape the challenged governmental policy is the political arena through the voting process.

*Miles v. Idaho Power Co.,* 116 Idaho 635, 641–42, 778 P.2d 757, 763–64 (1989). Our analysis of this issue must focus on the party seeking relief and not on the issues the party seeks to adjudicate. *Miles,* 116 Idaho at 641, 778 P.2d at 763.

■ The Scotts are disappointed bidders. They submitted a bid for a pupil transportation contract, and they were not awarded the contract. In *Neilson & Co. v. Cassia and Twin Falls County Joint Class A Sch. Dist. 151,* 96 Idaho 763, 536 P.2d 1113 (1975), the second lowest bidder (Neilson) on a contract to build a new school brought suit against the school board, alleging that the lowest bidder's bid was unresponsive and void. Neilson sought relief under the applicable competitive bidding statute, which dictated that the contract go to the lowest responsible bidder. Neilson alleged that the lowest bidder was not a "responsible" bidder. Thus, Neilson was a disap-

pointed bidder; it submitted a bid for a contract to build a new school, and it was not awarded the contract. This Court held for Neilson, remanding the case to the district court for a determination of damages. Like Neilson, the Scotts do not bring a generalized grievance suffered by all citizens and taxpayers, but instead bring a grievance peculiar to them. The Scotts do have standing to maintain this action.

### IV.

As the losing party below, the Scotts are not entitled to attorney fees at the district court level. I.R.C.P. 54(e)(1). Likewise, as the losing party on appeal, we decline to award attorney fees to the Scotts. *See Chambers v. Thomas,* 123 Idaho 69, 74, 844 P.2d 698, 703 (1992).

### V.

On cross-appeal, Buhl and Mayflower argue that they are entitled to attorney fees pursuant to I.C. § 12–120(3). This statute provides:

> (3) In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, guaranty, or contract relating to the purchase or sale of goods, wares, merchandise, or services and in any commercial transaction unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.

> The term "commercial transaction" is defined to mean all transactions except transactions for personal or household purposes. The term "party" is defined to mean any person, partnership, corporation, association, private organization, the state of Idaho or political subdivision thereof.

In *Brower v. E.I. DuPont De Nemours & Co.,* 117 Idaho 780, 792 P.2d 345 (1990), this Court thoroughly addressed the application of subsection (3) of I.C. § 12–120. In *Brower,* we applied the statute in the following manner:

> In the present case, Brower's complaint alleges that DuPont's representative induced his reliance, causing him to purchase and apply Glean [a herbicide] to his land, resulting in damages. The only commercial transaction involved is the purchase by Brower of the DuPont chemicals from a local co-op. If there is any contract involved in this case it is not a contract surrounding that purchase, but one that might have been implied from the facts surrounding the relationship between DuPont and Brower. We cannot say that this case revolves around a commercial transaction sufficient to implicate the terms of I.C. § 12–120(3).

*Brower,* 117 Idaho at 784, 792 P.2d at 349.

In the present case, the Scotts' complaint alleges that Buhl failed to follow a competitive bidding statute, I.C. § 33–1510, in awarding a contract to Mayflower, and that Mayflower's bid was a nonresponsive bid. The Scotts are not involved in any contractual relationship with either Buhl or Mayflower; they are not seeking relief upon the basis of a contract, but instead upon the basis of a competitive bidding statute. This case does not revolve around a commercial transaction at all. Therefore, we hold that Buhl and Mayflower are not entitled to attorney fees on appeal pursuant to I.C. § 12–120(3)

Cross-appellants also claim attorney fees on appeal pursuant to I.C. § 12–121 and I.R.C.P. 54(e)(1), contending that the appeal was brought or pursued frivolously, unreasonably, or without foundation. We disagree. Our review of the record and the applicable law convinces us that this appeal was brought and pursued "upon a meritorious, reasonable, and well founded legal theory." *See Black v. Young,* 122 Idaho 302, 310, 834 P.2d 304, 312 (1992).

### CONCLUSION

For the foregoing reasons, we affirm the decision of the district court.

No costs or fees on appeal.

BISTLINE, JOHNSON and TROUT, JJ., and MICHAUD, J., Pro Tem, concur.