# IN THE SUPREME COURT OF IOWA

No. 12–0491

Filed July 5, 2013

**HORSFIELD MATERIALS, INC.,**

Appellant,

vs.

**CITY OF DYERSVILLE,**

Appellee.

---

Appeal from the Iowa District Court for Dubuque County, Andrea J. Dryer (trial) and Lawrence H. Fautsch (motion to compel discovery), Judges.

A materials supplier appeals from the district court's denial of declaratory and injunctive relief in an action against a municipality for alleged violations of Iowa's public bidding and open records laws. **DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED.**

Vernon P. Squires of Bradley & Riley, PC, Cedar Rapids, for appellant.

Douglas M. Henry and P. Christopher Williams of Fuerste, Carew, Juergens & Sudmeier, P.C., Dubuque, for appellee.

**MANSFIELD, Justice**.

In this case, we must decide whether an entity excluded from a city's list of preapproved material suppliers on a public construction project can obtain a declaratory judgment that such a preapproval process violated Iowa's public bidding statute and constitutional guarantees of equal protection and due process. Additionally, we must decide whether the same entity should have been granted relief under Iowa's open records law based on the city's delay in responding to an open records request.

We conclude the supplier lacked standing to challenge the preapproval process under Iowa's public bidding statute. We find the supplier did have standing to assert its constitutional claims but reject those claims on the merits. Finally, we hold the city's substantial and inadequately explained delay in responding to the supplier's open records request violated the law. For these reasons, we affirm the judgment entered by the district court dismissing the plaintiff's public bidding and constitutional claims, but reverse in part the district court's ruling that denied the plaintiff relief under the open records law.

### I. Facts and Procedural Background.

Plaintiff Horsfield Materials, Inc. (Horsfield) is a construction supply business based in Epworth, about ten miles east of Dyersville. Horsfield produces and sells construction materials including aggregate (e.g., crushed stone, sand, and gravel) and ready-mix concrete. Horsfield supplies a variety of customers such as individuals, large concrete contractors, government bodies, and developers.

Horsfield has a sister company, Horsfield Construction, Inc., that does business as a construction contractor. Matthew Horsfield is the president of both firms. In 2005, Horsfield Construction became

embroiled in litigation with Dyersville over a downtown pavement, sidewalk, and streetlight replacement project that Horsfield Construction had agreed to perform for the City.

This litigation concerns the Wastewater Treatment Facility Phase II Improvements, which consisted of modifications and upgrades to Dyersville's existing wastewater treatment facility. The estimated cost of the project was approximately $1.2 million. The project was largely funded as an Iowa Green Initiative through the Iowa Revolving Loan Fund, but $300,000 of federal stimulus money was available. To qualify for these funds, the City had to issue a notice to proceed by mid-February 2010.

Because the estimated cost of the project exceeded $100,000, the project fell under the requirements of Iowa's public construction bidding statute. *See* Iowa Code §§ 26.1–.15 (2009). Chapter 26 imposes certain requirements on the bidding and selection process for public construction projects, including notice, public hearing, and selection of the "lowest responsive, responsible bidder." *Id.* § 26.9.

Gary Sejkora, a licensed professional engineer retained by the City, finalized the proposed plans and specifications for the wastewater project on December 3, 2009. These stated that a public hearing would be held on the plans and specifications on December 21, 2009, and that the deadline for submitting bids on the project would be January 7, 2010.

Two special conditions in the specifications limited the aggregate and concrete suppliers that could be used on the project to three named companies. The relevant language stated as follows:

> 27. **AGGREGATE SUPPLIERS**: Bard Concrete, River City Stone, and Kuhlman Quarries are approved aggregate suppliers subject to compliance with material specifications.

Other aggregate suppliers must obtain approval from the City and Engineer prior to bidding.

28. **CONCRETE SUPPLIERS**: Bard Concrete, Apex Concrete, and Flynn Ready-Mix are approved concrete suppliers subject to compliance with material specifications. Other concrete suppliers must obtain approval from the City and Engineer prior to bidding.

This was not the first time Horsfield had been excluded from a list of preapproved suppliers. Another city project in the summer of 2009 had similarly limited suppliers to specific companies other than Horsfield. Horsfield suspected that it was being "blackball[ed]" because of its sister company's involvement in litigation with the City.

Under the public hearing requirement, a city may not enter into a contract for a public improvement project "until the governmental entity has held a public hearing and has approved the proposed plans, specifications, and form of contract, and estimated total cost of the public improvement." *Id.* § 26.12.

On the day of the December 21 hearing, Horsfield's attorney faxed a letter to Sejkora and to the city clerk, asking for an explanation as to why other suppliers, and not Horsfield, had been preapproved. Horsfield also asked what steps it could take to become an approved supplier for the wastewater project. Additionally, the letter contained Horsfield's first open records request to Dyersville. Horsfield requested

> all records that relate to, reference, or concern in any way the procedures, guidelines, publications, standards, processes, and notifications used in: 1) determining the "approved" suppliers in paragraphs 27 and 28 of the contract specifications; 2) determining that Horsfield Materials, Inc. was not an "approved" supplier, and 3) determining "approved" and "not approved" suppliers or contractors generally by the City of Dyersville, or its agents, on this and other publicly bid projects. The request includes a list of all suppliers and contractors currently "approved" and "not approved" by the City of Dyersville. This request also includes, without limitation, all communications with any supplier or contractor concerning the approval process

and designation as an "approved" supplier. It also includes, without limitation, all records containing any reference or mention of Horsfield Materials, Inc., Horsfield Construction, Inc., or their agents, to the extent the records relate in any way to approval or exclusion as a supplier or contractor for this or any other project for the City of Dyersville.

Matthew Horsfield spoke at the hearing that evening, requesting that his company be named an additional preapproved supplier. The city council did not grant his request and instead, approved the plans and specifications with the existing versions of paragraphs 27 and 28.

The following day, December 22, Horsfield's attorney faxed another letter to the City, renewing the company's request to become a preapproved supplier of aggregate and concrete. Horsfield also clarified that its records request included electronic information and documents in possession of any city employee, any city council member, or the mayor.

On December 30, Matthew Horsfield emailed Sejkora, again asking to become a preapproved supplier for the wastewater project. Sejkora declined to preapprove Horsfield because "[w]e do not have any experience working with Horsfield Materials on projects comparable to the Dyersville Wastewater Treatment Facility Phase II project. Therefore, we require documentation prior to considering approval." Sejkora then referred Horsfield to an addendum issued that day that contained a new Special Condition 29. This condition allowed a general contractor to request approval of an alternative supplier for aggregate or concrete within thirty days *after* being awarded the contract.

Under Special Condition 29, the request for approval was required to be in writing and to include details about the proposed supplier's business such as contact information, history of the business and production facilities, and resumes of "key individuals involved."

Additionally, a number of quality test results from the Iowa Department of Transportation (DOT) were required, as well as a minimum of three references from engineers, contractors, and owners that had used the supplier's products before.

Preapproved suppliers of course did not need to provide this information, but Sejkora later testified that these requirements reflected the underlying criteria for preapproval. Yet Sejkora could not recall when any of the preapproved suppliers had last submitted the aggregate or concrete quality control reports that Special Condition 29 contemplated.

Horsfield's aggregate and concrete have never been deemed unacceptable by the DOT, which certifies aggregate and concrete sources. Horsfield also maintained that the City's offer in Special Condition 29 to approve a new supplier after the contract award was not a realistic option. A general contractor would be very reluctant to antagonize the supplier whose bid it had used to gain the contract by later trying to substitute a new supplier.

That same day, December 30, Horsfield submitted an additional open records request to Dyersville, seeking "all documents and records relating in any way to Addendum No. 2 to the Contract and/or any other documents and records relating to an alternative suppliers approval process." The following day, the City provided Horsfield with thirty-nine pages of records in response to the outstanding requests.

Horsfield's attorney openly questioned whether the thirty-nine pages amounted to all the responsive documents. On January 7, 2010, the day bidding closed on the wastewater project, Horsfield again clarified the scope of its requests, pointing out that they included documents in the possession of Sejkora, even though he was not an

employee of the city. Horsfield took the position that Sejkora, as engineer on this project, was the City's agent.

On January 11, 2010, the city council awarded the project to Portzen Construction, having concluded that it was the lowest responsible, responsive bidder. Portzen's bid totaled $1,323,537, approximately nine percent above the engineer's estimate. Horsfield never submitted information under Special Condition 29, and Horsfield Construction never bid on the wastewater project.

That same day, Horsfield submitted its final open records request relevant to this case. This request sought:

> 1. All records that concern, reference, or relate in any way to the proposed wastewater treatment facility improvements referenced above.
>
> 2. All records that concern, reference or relate in any way to Matt Horsfield, Horsfield Construction, Inc., or Horsfield Materials, Inc.

One day after receiving this request, Dyersville's attorney responded that because of Horsfield Construction's prior legal dispute with the City, the volume of responsive documents would be very large. He suggested that Horsfield narrow its requests to exclude documents produced in the litigation or created over twelve months ago. By email dated January 21, 2010, Horsfield's attorney agreed to these two limitations. On January 25, Dyersville's attorney wrote to Horsfield's attorney, explaining the reimbursement that the City would expect for its costs associated with retrieving the records and stating that the City would begin working on Horsfield's request.

On January 26, Dyersville's attorney sent Horsfield's attorney a privilege log for five emails relating to Special Condition 29 that the City considered protected by the attorney–client privilege. On February 7,

having not received any documents in response to its January 11 request (as modified on January 21), Horsfield's attorney emailed Dyersville's attorney requesting a status update. A few days later, the city administrator Mick Michel sent an internal email to the City's attorney, indicating that progress was slow on the document production. One of the problems was that the potentially responsive "documents" included forty-two hours of video of city council meetings and other public hearings, which the City believed needed to be screened to determine whether they were responsive to the request.

On March 18, 2010, Horsfield brought the present lawsuit in two counts. The first count sought relief under the Open Records Act; the second count asserted a claim that the City's practice of preapproving suppliers violated Iowa's public bidding statute, as well as federal and state due process and equal protection guarantees.

Meanwhile, the parties' dealings on the January 11 open records request continued. On March 25, Dyersville's attorney wrote Horsfield's attorney, updating him on the status of the open records request. He informed Horsfield's attorney that forty-two hours of video of city council meetings and other public hearings still needed to be reviewed and sought Horsfield's input. The City's counsel indicated that Horsfield could provide a hard drive onto which the City would copy the entire forty-two hours for Horsfield's review.

On April 5, the attorneys for Horsfield and the City exchanged emails about records other than the video recordings. The next day, April 6, Dyersville produced 617 pages of documents in response to the January 11 request. Two days later, the City's attorney provided a privilege log for eight emails the City had withheld. He also indicated that he was still awaiting instructions concerning the video.

On June 2, Horsfield filed a motion to compel discovery. Horsfield's principal argument was that the City had wrongfully withheld emails exchanged between Sejkora (who was not a city employee) and the City's attorney. The district court denied the motion, citing *Tausz v. Clarion-Goldfield Community School District*, 569 N.W.2d 125, 127 (Iowa 1997). However, the City subsequently elected to produce the emails and used them at trial.

During the two-day trial to the court that took place on July 28–29, 2011, Matt Horsfield testified that Horsfield Materials has sources for materials in Dubuque County, has supplied most of the major concrete contractors in the area, has supplied the county and the Iowa DOT, and wanted to supply materials for Dyersville jobs. He also testified that in two additional public works projects in 2011, Dyersville has continued to use a list of preapproved suppliers that excludes Horsfield.

Following trial, the district court entered findings of fact and conclusions of law that rejected each of Horsfield's claims. Concerning Horsfield's challenge to the City's preapproval process, the court found that Horsfield lacked standing:

> If an unsuccessful bidder on a public construction contract lacks standing to challenge the legality of bidding procedures, then an aggregate and concrete supplier desirous of selling its products to a bidder, and perhaps ultimately to the governmental entity if the bid is successful, also lacks standing to challenge a portion of the bidding procedures.

Regarding Horsfield's open records claim, the district court concluded no violation had occurred:

> Under the circumstances, the delay in making the city's records that were responsive to the January request available did not amount to a refusal to make the records available. The city made good faith efforts to comply, and did substantially comply, with Chapter 22 requirements.

Horsfield filed a motion to enlarge under Iowa Rule of Civil Procedure 1.904(2), requesting the district court to separately address and analyze its constitutional claims. It argued that Horsfield had standing to bring its constitutional claims regardless of any lack of standing under the public bidding statute. The district court denied the motion. Horsfield now appeals.

## II. Standard of Review.

Horsfield filed the present petition in equity seeking injunctive and declaratory relief. In their briefing, the parties agree that the scope of review is de novo. However, "[t]he fact the action was filed on the equity docket does not control our review." *City of Riverdale v. Diercks*, 806 N.W.2d 643, 651 (Iowa 2011). Rather, the manner in which the district court actually tried the action determines our standard of review. *Id.* at 651–52. Here, the district court ruled on evidentiary objections, but any rulings excluding evidence were "minor and did not have a significant effect on the proceedings." *Passehl Estate v. Passehl*, 712 N.W.2d 408, 414 (Iowa 2006). Accordingly, we will apply a de novo standard of review. This means that the district court's findings of fact are not binding, but we will "give deference to those findings because the district court had the opportunity to assess the credibility of the witnesses." *Hensler v. City of Davenport*, 790 N.W.2d 569, 578 (Iowa 2010).

## III. Analysis.

**A. Standing Under Iowa Code Section 26.9.** Horsfield alleges that Dyersville's ongoing use of preapproved suppliers for public contracts violates Iowa's public bidding statute. Specifically, Horsfield contends that the practice violates Iowa Code section 26.9, which provides, "The contract for the public improvement must be awarded to the lowest responsive, responsible bidder." In Horsfield's view, by

limiting the universe of potential aggregate and concrete suppliers, the City undermines the legal requirement in section 26.9 that it get the best deal for its taxpayers. *See, e.g.*, Philip L. Bruner & Patrick J. O'Connor, Jr., 1 *Bruner & O'Connor on Construction Law* § 2:45 (2012) ("Limitation of competition through the use of unjustifiably restrictive product specifications violates the objectives of competitive sealed bidding."); *see also Kratz v. City of Allentown*, 155 A. 116, 117 (Pa. 1931) ("The city had the right to call for stone of a particular quality and fitness, but not from a particular quarry. To do the latter might create a monopoly and prevent competitive bidding."). The initial question we must answer is whether Horsfield has standing to raise this claim.

Our self-imposed standing inquiry has two distinct prongs, each of which a plaintiff must satisfy to proceed with a claim. "Our cases have determined that a complaining party must (1) have a specific personal or legal interest in the litigation and (2) be injuriously affected." *Citizens for Responsible Choices v. City of Shenandoah*, 686 N.W.2d 470, 475 (Iowa 2004); *see also Alons v. Iowa Dist. Ct.*, 698 N.W.2d 858, 869 (Iowa 2005). This inquiry is separate from, and precedes, the merits of a case. *See Alons*, 698 N.W.2d at 864 ("Even if the claim could be meritorious, the court will not hear the claim if the party bringing it lacks standing.").

We have previously considered our standing doctrine as it applies to unsuccessful bidders on public construction projects. We have consistently held that our public bidding statute seeks " 'to secure by competition among bidders, the best results at the lowest price, and to forestall fraud, favoritism and corruption in the making of contracts.' Such statutes were enacted for the benefit of the taxpayers, not the bidders." *Elview Constr. Co. v. N. Scott Cmty. Sch. Dist.*, 373 N.W.2d 138, 141 (Iowa 1985) (quoting *Istari Constr., Inc. v. City of Muscatine*, 330

N.W.2d 798, 800 (Iowa 1983)) (holding that an unsuccessful bidder does not have standing in an equity action to void public project contracts).

As a result, we have denied standing to unsuccessful bidders that seek to void a municipality's contract with a successful bidder or seek damages for lost profits. *See Garling Constr., Inc. v. City of Shellsburg*, 641 N.W.2d 522, 524 (Iowa 2002). In *Garling*, a general contractor was unsuccessful in bidding on a municipal building project even though it made the lowest bid and the city made no finding that it was not responsible. *Id.* at 522–23. The evidence suggested that the city preferred another, costlier, bidder because it was local. *Id.* at 523. The unsuccessful bidder petitioned for writ of certiorari, demanding damages. *Id.* Despite an apparent violation of the public bidding statue, we held that the unsuccessful bidder lacked standing to collect damages. *Id.* at 524–25. We reasoned that it

> "would be contrary to the public interest the bidding laws were designed to protect, since it would twice penalize taxpayers by compelling them to pay not only the excess over what they would have paid if the contract were properly awarded, but also the amount of profit lost by the contractor whose bid was wrongfully rejected."

*Id.* (quoting James L. Isham, Annotation, *Public Contracts: Low Bidder's Monetary Relief Against State or Local Agency for Nonaward of Contract*, 65 A.L.R. 4th 93, 111 (1988) [hereinafter Isham]). "The paramount purpose of the competitive bidding statute is to protect the public as taxpayers, and that purpose must not be impaired in interpreting the statute." *Master Builders of Iowa, Inc. v. Polk County*, 653 N.W.2d 382, 394 (Iowa 2002) (holding that Iowa's competitive bidding statute does not bar project labor agreements, whereby bidders agree on collective bargaining terms before bidding, and only parties to the agreement will be chosen for the contract).

In both *Garling* and *Elview,* we used "standing" terminology to explain our decisions. 641 N.W.2d at 523–24; 373 N.W.2d at 141. Related to standing, but generally distinguished from it, is the question whether the plaintiff has a "cause of action" under the statute in question. *Bond v. United States,* __ U.S. __, __, 131 S. Ct. 2355, 2362–63, 180 L. Ed. 2d 269, 277–78 (2011) (discussing the distinction between the two concepts). Arguably, we could have said in *Elview* and *Garling* that the unsuccessful bidder did not have a cause of action, because the issue was not whether it had allegedly suffered a cognizable injury, but whether it could bring the claim in question over that alleged injury. But having gone down the standing path in these two prior cases, we will remain there for the present case.

We have, however, left open the possibility that unsuccessful bidders may have standing in actions for injunction, mandamus, or declaratory judgment. *Garling,* 641 N.W.2d at 524–25. "Denial of standing to an unsuccessful bidder does not mean violation of a bidding statute will necessarily go unchallenged. An injunction action, mandamus, or declaratory judgment might still be available." *Id.* at 524. In fact, many other states have conferred standing on an unsuccessful bidder in these circumstances.[1]

---

[1]*See, e.g.*, *Ala. Mun. & Envtl. Eng'rs, Inc. v. Slaughter Constr. Co.*, 961 So.2d 889, 894 (Ala. Civ. App. 2007) (declining to allow unsuccessful bidder to seek monetary damages from violation of competitive bidding statute and noting that remedy is limited to injunction as provided for in the statute); *City of Phoenix v. Wittman Contracting Co.,* 509 P.2d 1038, 1040 (Ariz. Ct. App. 1973) ("[A]n unsuccessful bidder, arbitrarily and capriciously refused award of a public contract, is a 'party beneficially interested' with sufficient standing to seek mandamus relief."); *Walt Bennett Ford, Inc. v. Pulaski Cnty. Special Sch. Dist.*, 624 S.W.2d 426, 428 (Ark. 1981) (holding that an unsuccessful bidder which alleged it was the lowest qualified bidder had standing to sue to void an allegedly improper public project contract); *Kajima/Ray Wilson v. L.A. Cnty. Metro. Transp. Auth.,* 1 P.3d 63, 68 (Cal. 2000) ("California courts long ago authorized a disappointed bidder to seek a writ of mandate to have a contract set aside."); *Lawrence Brunoli, Inc. v. Town of Branford*, 722 A.2d 271, 273–74 (Conn. 1999) ("Providing unsuccessful bidders with an equitable remedy alone is consistent with the policies that

we previously have identified as underlying the municipal bidding statutes."); *Mid-Am. Waste Sys. of Fla., Inc. v. City of Jacksonville*, 596 So.2d 1187, 1188–89 (Fla. Dist. Ct. App. 1992) (holding that second most responsible bidder has standing to seek injunctive and declaratory relief against awarding contract to sister corporation of waste hauler that had been convicted of price fixing); *Hilton Constr. Co. v. Rockdale Cnty. Bd. of Ed.*, 266 S.E.2d 157, 161 (Ga. 1980) (allowing low bidder to seek mandamus and injunctive relief for alleged violation of public bidding law); *Arakaki v. States*, 952 P.2d 1210, 1214 (Haw. 1998) (noting that unsuccessful bidder may seek to have an agency order a "remand and reconsideration" by government body awarding contract); *Scott v. Buhl Joint Sch. Dist. No. 412*, 852 P.2d 1376, 1382–83 (Idaho 1993) (holding disappointed bidders had standing to bring suit seeking declaratory judgment, mandamus, and injunction); *Ct. St. Steak House, Inc. v. County of Tazewell*, 643 N.E.2d 781, 784 (Ill. 1994) (reaching the merits of a mandamus action challenging a county's exercise of discretion under a public bidding statute); *Shook Heavy & Envtl. Constr. Grp. v. City of Kokomo*, 632 N.E.2d 355, 358 & n.7 (Ind. 1994) (noting that unsuccessful bidders may challenge contract award if it alleges fraud or collusion); *Sutter Bros. Constr. Co. v. City of Leavenworth*, 708 P.2d 190, 196 (Kan. 1985) ("An unsuccessful bidder's remedy is to seek injunctive relief preventing the award of the contract to one not legally entitled thereto."); *Pendleton Bros. Vending, Inc. v. Commonwealth Fin. & Admin. Cabinet*, 758 S.W.2d 24, 28 (Ky. 1988) (noting that procurement statute confers standing to unsuccessful bidders to challenge award of contract in violation of the statute); *Airline Constr. Co. v. Ascension Parish Sch. Bd.*, 568 So.2d 1029, 1032 (La. 1990) (noting that under Louisiana's public bidding statute, which requires awarding contracts to the lowest responsible bidder, "an unsuccessful bidder may sue to enjoin the public body from executing the contract or to set aside the award of the contract to another bidder when the public body acted arbitrarily in selecting the successful bidder"); *Associated Subcontractors of Mass., Inc. v. Univ. of Mass. Bldg. Auth.*, 810 N.E.2d 1214, 1218 (Mass. 2004) (holding that "subcontractors[] have standing to bring this suit" because, among other things, "the claim is one for declaratory judgment"); *Groves v. Dep't of Corr.*, 811 N.W.2d 563, 568 (Mich. Ct. App. 2011) (noting that, when unsuccessful bidder alleges fraud, abuse, or illegality, it may seek injunctive relief against municipality for competitive bidding violations); *Tel. Assocs., Inc. v. St. Louis Cnty. Bd.*, 364 N.W.2d 378, 382 (Minn. 1985) ("While it is true that an unsuccessful bidder has standing to maintain a proceeding to review the award of a contract in violation of [competitive bidding law], this procedure is sanctioned merely to ensure enforcement of the statute.") (citation and internal quotation marks omitted); *Gulf Oil Corp. v. Clark County*, 575 P.2d 1332, 1333–34 (Nev. 1978) ("A timely challenge is compatible with the public interest since it serves to force compliance with the purpose of the bidding procedure."); *Jerkens Truck & Equip., Inc. v. City of Yonkers*, 579 N.Y.S.2d 417, 422 (App. Div. 1992) (holding an unsuccessful lowest bidder had standing to bring writ of prohibition claim to prevent city from awarding public contract to the successful bidder); *Cementech, Inc. v. City of Fairlawn*, 849 N.E.2d 24, 27 (Ohio 2006) (noting that a rejected bidder's remedy is limited to injunctive relief); *Associated Builders & Contractors of R.I., Inc. v. Dep't of Admin.*, 787 A.2d 1179, 1186 (R.I. 2002) (holding that general contractors disqualified from bidding had standing to seek injunctive relief challenging project labor agreement requirement under the competitive bidding statute); *Sloan v. Dep't of Transp.*, 618 S.E.2d 876, 878–79 (S.C. 2005) (recognizing a "public importance" exception to the standing rule in the public bidding context); *H & W Contracting, LLC v. City of Watertown*, 633 N.W.2d 167, 172–73 (S.D. 2001) ("Because a disappointed bidder's standing is based on the protection of public interests, it extends only to suits for declaratory or equitable relief seeking to compel compliance with the

Horsfield argues that its declaratory judgment claim fits into the class of claims that most other states allow and as to which *Garling* left the door open. But there is a key difference. Horsfield is not an unsuccessful bidder. It is a prospective supplier.

Because Horsfield is a supplier rather than a contractor, it is more distant from chapter 26's paramount purpose of protecting the taxpayer. A contractor that claims to have been the low bidder can argue that if the contract were awarded to it, taxpayers would directly benefit. But the relationship between relief to Horsfield and relief for Dyersville taxpayers is more tenuous. Horsfield's argument has to run that if the City did not have a defined list of preapproved suppliers, the resulting bids would on balance be lower and better for the City. Whatever the possible merits of this argument, it is a more indirect one than a disappointed bidder might assert.

In challenges to administrative agency actions, the standing inquiry has required " 'the interest sought to be protected by the complainant to be arguably within the zone of interests to be protected or

---

competitive bid laws."); *Metro. Air Research Testing Auth., Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 842 S.W.2d 611, 617 (Tenn. Ct. App. 1992) (noting "in the absence of a statute, an unsuccessful bidder's standing extends only to equitable or declaratory relief to ensure enforcement of required competitive bidding procedures"); *Peerless Food Prods., Inc. v. State*, 835 P.2d 1012, 1015 (Wash. 1992) ("Although a public contractor whose low bid is wrongfully rejected by a government entity is often held to have standing to prosecute an action for injunction, mandamus, or declaratory judgment, it is less frequently held that there is a remedy for damages in such cases[.]") (citation and internal quotation marks omitted); *W. Va. Util. Contractors Ass'n v. Laidley Field Athletic & Recreational Ctr. Governing Bd.*, 260 S.E.2d 847, 850 (W. Va. 1979) (holding an association of utilities contractors, that were prevented from bidding on a public project, had standing to seek declaratory judgment); *D.M.K., Inc. v. Town of Pittsfield*, 711 N.W.2d 672, 678 (Wis. Ct. App. 2006) (citing *Aqua-Tech, Inc. v. Como Lake Prot. & Rehab. Dist.*, 239 N.W.2d 25, 31 (Wis. 1976)) (stating that an unsuccessful bidder's remedy for competitive bidding violations is injunctive relief, not damages); *see also* Isham, 65 A.L.R. 4th at 103 ("Declaratory judgment appears to be a popular and viable method of challenging the validity of contracts awarded to other than the lowest responsible bidder.").

regulated by the statute.'" *Godfrey v. State*, 752 N.W.2d 413, 419 (Iowa 2008) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S. Ct. 827, 830, 25 L. Ed. 2d 184, 188 (1970)). The circumstance here is somewhat analogous: Horsfield is challenging the action of a municipality under a statute regulating the municipality's conduct; it is not asserting a constitutional claim here. *See id.* (distinguishing standing to bring constitutional claims).

Other jurisdictions have generally found that potential subcontractors, like Horsfield, are not proper parties to invoke remedies under the competitive bidding statutes. For example, in *Connecticut Associated Builders & Contractors v. City of Hartford*, the Connecticut Supreme Court affirmed a trial court's ruling that subcontractors lacked standing to challenge a project labor agreement. 740 A.2d 813, 822 (Conn. 1999). The court reasoned that allowing subcontractor standing was less certain to vindicate the public interest in getting the lowest and best overall bids and more likely to complicate and delay the bidding process. As the court explained:

> The trial court determined that the subcontractors did not have standing because they did not have a legal stake in the bidding process. The court reasoned that a diminished possibility of potential work as subcontractors was too attenuated an interest to give the subcontractors a legal stake in the bidding process. . . .
>
> . . . .
>
> The problem with the plaintiffs' arguments is that the limited standing we have granted to disappointed and excluded contractors to bring challenges based on competitive bidding laws is designed to protect the interests of the public, not those of the contractors. The plaintiffs do not dispute the fact that the subcontractors did not and could not have bid on the project. We can discern no reason for expanding the "private attorney general" standing granted to contractors that bid or were precluded from bidding on a public project. On the contrary, permitting legal challenges

> from the numerous subcontractors that potentially could be affected by a particular bidding process would be likely to upset the balance in protecting the public's dual interests in fair public bidding processes and in the efficient completion of public works projects.

*Id.* at 822–23; *see also Amtech Sys. Corp. v. Ill. State Toll Highway Auth.*, 637 N.E.2d 619, 625 (Ill. App. Ct. 1994) (holding that a supplier lacked standing to challenge specifications that allegedly required any successful bidder to use another supplier's product); *Transactive Corp. v. N.Y. State Dep't of Soc. Servs.*, 706 N.E.2d 1180, 1184 (N.Y. 1998) (holding that a subcontractor, whose bid was part of an unsuccessful general contractor's bid, did not have standing to bring a competitive bidding challenge, because it was "not within the zone of interests protected by" the public bidding statute). We agree with the reasoning in those cases and adopt it here.

We do not foreclose the possibility that a contractor bidding on a project could have standing to bring a claim under chapter 26 for mandamus, injunction, or declaratory relief asserting that it lost the bid because the city wrongfully disallowed a supplier it wanted to use. Nor do we endorse such a claim. We simply indicate that from a standing perspective, this kind of claim would appear to be a better mechanism for vindicating the interests of taxpayers and would present a more clear and direct injury.

Horsfield cites our recent decision in *Hawkeye Foodservice Distribution, Inc. v. Iowa Educators Corp.* and urges that harm to a company's "competitive interests" can satisfy the injury requirement for standing. *See* 812 N.W.2d 600 (Iowa 2012). But the facts, the procedural posture, and the statutes involved in that case were different. In *Hawkeye Foodservice*, the plaintiff food service company filed a petition alleging that the defendant government agencies had, in violation

of Iowa law, established an unlawful entity (also named as a defendant) that "award[ed] Hawkeye's competitor a prime vendor contract," thereby "taking business away from Hawkeye." *Id.* at 606. In other words, the plaintiff (unlike Horsfield) was like an unsuccessful bidder that would have received a contract but for the defendants' allegedly illegal conduct. Also noteworthy is that the case had been dismissed on the pleadings by the district court. *Id.* at 604. Thus, we concluded the plaintiff's allegation that "it has lost and continues to lose business based on the AEAs' illegal actions" was sufficient for that stage of the proceedings. *Id.* at 607. Additionally, the plaintiff in *Hawkeye Foodservice*, a private company, was suing under laws designed to circumscribe the authority of the defendants to engage in private-type activities. *Id.* at 610–13. Here Horsfield is bringing suit under bidding statutes intended to protect taxpayers, not companies like Horsfield. Accordingly, we do not believe that *Hawkeye Foodservice* affects the standing analysis in this case under chapter 26.[2]

**B. Horsfield's Constitutional Claims.** Horsfield alleges that Dyersville's ongoing exclusion of Horsfield from its list of preapproved suppliers for public contracts violates federal and state due process and equal protection guarantees. We agree with Horsfield that the standing analysis for these claims differs from that for the claims under the bidding statute. *See Godfrey*, 752 N.W.2d at 419–20 (discussing constitutional standing). In cases involving "public rights," we "no longer require the litigant to allege a violation of a private right and do not

---

[2]As the district court found, there is no issue of taxpayer standing here. *See, e.g.*, *Miller v. City of Des Moines*, 143 Iowa 409, 423–24, 122 N.W. 226, 231–32 (1909) (finding that taxpayers had standing to maintain an action to enjoin the performance of a contract entered into by the city). The record is undisputed that Horsfield does not own property within Dyersville. Horsfield does not maintain on appeal that it has standing as a taxpayer.

require traditional damages to be suffered. Instead, we require the litigant to allege some type of injury different from the population in general." *Id.* at 420.

Horsfield has demonstrated that a government practice has put it in a separate category from certain other suppliers and thereby disadvantaged it. Three companies are approved to supply aggregate and concrete; Horsfield, which presented proof that it is equally qualified, remains on the outside looking in. Horsfield also has shown that it regularly supplies numerous contractors in Dubuque County with aggregate and concrete and is being prevented from doing so on Dyersville projects due to its ongoing exclusion from the preapproved supplier list. True, Horsfield has not established that its exclusion from the City's list has caused it to lose the profits associated with a particular project. However, it has proved a negative, i.e., that its ongoing exclusion from the preapproved supplier list and the practical obstacles associated with postaward approval make it unlikely it will be able to get work on city projects—far less likely than the privileged three. This is certainly an "injury different from the population in general" and more than an "abstract claim." *Godfrey*, 752 N.W.2d at 420–21 (internal quotation marks omitted). We should look at the question this way: If hypothetically the City intentionally included only white-owned companies on its preapproved list, would a minority-owned company on these facts have standing to sue for an equal protection violation? We believe the answer is clearly yes.

Thus, for its constitutional claims, Horsfield has met the "injury in fact" element of standing. *See Godfrey*, 752 N.W.2d at 421 (quoting the Supreme Court, in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351, 364 (1992), as requiring that a

"plaintiff must establish a causal connection between the injury and the conduct complained of and that the injury is likely, as opposed to merely speculative, to be redressed by a favorable decision" (citation and internal quotation marks omitted)).

An entity "need not demonstrate that it has been, or will be, the low bidder on a Government contract. The injury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing.' " *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211, 115 S. Ct. 2097, 2105, 132 L. Ed. 2d 158, 171 (1995) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 667, 113 S. Ct. 2297, 2304, 124 L. Ed. 2d 586, 598 (1993)) (finding that a subcontractor had standing to proceed with an equal protection challenge).

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Ne. Fla. Chapter*, 508 U.S. at 666, 113 S. Ct. at 2303, 124 L. Ed. 2d at 597.

However, we agree with the City that Horsefield's constitutional claims fail on their merits. Because no suspect class or fundamental right is at issue, we apply the rational basis test. *King v. State*, 818 N.W.2d 1, 25, 31 (Iowa 2012); *see also Master Builders*, 653 N.W.2d at 398 (finding that an equal protection challenge to the inclusion of a project labor agreement in competitive bids should be evaluated under

the rational basis test).[3] The rational basis test is a "deferential standard." *Ames Rental Prop. Ass'n v. City of Ames,* 736 N.W.2d 255, 259 (Iowa 2007). For equal protection purposes, we must determine only whether the classification is "rationally related to a legitimate governmental interest." *Id.* "A statute or ordinance is presumed constitutional and the challenging party has the burden to 'negat[e] every reasonable basis that might support the disparate treatment.' " *Id.* (citation omitted). "The City is not required or expected to produce evidence to justify its legislative action." *Id.* Still, for state constitutional purposes, the government interest must be " 'realistically conceivable.' " *Qwest Corp. v. Iowa State Bd. of Tax Review,* 829 N.W.2d 550, 560 (Iowa 2013) (citation and emphasis omitted); *King,* 818 N.W.2d at 30; *Racing Ass'n of Cent. Iowa v. Fitzgerald,* 675 N.W.2d 1, 7–8 (Iowa 2004). And in the equal protection context, the means chosen to advance that interest cannot be "so overinclusive and underinclusive as to be irrational." *State v. Mitchell,* 757 N.W.2d 431, 439 (Iowa 2009); *see also Racing Ass'n of Cent. Iowa,* 675 N.W.2d at 10.

---

[3]Horsfield argues that "a fundamental right applies, namely its liberty interest in the right to contract." However, to support that contention, it cites a case, *Koster v. City of Davenport,* which involved an alleged state impairment of an *existing* contract in violation of United States Constitution article I, section 10. *See* 183 F.3d 762, 766 (8th Cir. 1999). On the due process claim, the *Koster* court applied the rational basis test. *Id.* at 768–69. The United States Supreme Court has held for the better part of a century that the right to contract is not fundamental under the United States Constitution. *See W. Coast Hotel Co. v. Parrish,* 300 U.S. 379, 391, 57 S. Ct. 578, 581–82, 81 L. Ed. 703, 708 (1937) ("The Constitution does not speak of freedom of contract. . . . [R]egulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process."). Nor have we held in the past that the right to contract is a fundamental right triggering strict scrutiny under the Iowa Constitution. *See State v. Willard,* 756 N.W.2d 207, 213 (Iowa 2008) (applying a rational basis test to sex offender residency restrictions notwithstanding the defendant's argument that they affected his right to contract). Horsfield is not asserting any claim under article I, section 6 of the Iowa Constitution apart from traditional equal protection, and we have no occasion to consider whether another type of claim would be available.

Dyersville's preapproval process serves a realistically conceivable governmental interest in quality control. As Sejkora testified, "The effort was for quality control to make sure that we were able to obtain materials from . . . suppliers we knew through our experience to be capable of providing materials that complied with the specification technical requirements." And there is a reasonable fit between the means chosen and the goal. Sejkora explained that the City had twenty to thirty years of positive experience with each of the suppliers on the preapproved lists: "We've had a working relationship with the three identified and prior approved suppliers and over the years have seen this material come in." There is no indication the City excluded any suppliers from its preapproved lists that had a similar track record. While there are certainly other, perhaps better, ways to assure a quality supply of concrete and aggregate at a competitive price, we cannot say the City's process is so arbitrary as to violate equal protection or substantive due process. Accordingly, we reject Horsfield's equal protection and substantive due process claims.

Horsfield also contends that the City violated its procedural due process rights. "Under procedural due process, notice and an opportunity to be heard are required when a person's property interests are at stake." *Lewis v. Jaeger*, 818 N.W.2d 165, 181 (Iowa 2012). "Procedural due process requires that certain procedures be afforded (e.g., notice and an opportunity to be heard) before the government deprives a citizen of a liberty or property interest." *King*, 818 N.W.2d at 33 n.25. However, "[o]ur first inquiry in a procedural due process analysis is whether a protected liberty or property interest is involved." *Bowers v. Polk Cnty. Bd. of Supervisors*, 638 N.W.2d 682, 691 (Iowa 2002). The problem here is that Horsfield has no protected liberty or

property interest at stake, merely an unfulfilled desire to enter into contracts to supply materials for Dyersville public improvements. *See, e.g.*, *Greenwood Manor v. Iowa Dep't of Pub. Health*, 641 N.W.2d 823, 837–38 (Iowa 2002) (holding that nursing homes do not have a protected property interest in a competitor's not receiving a certificate of need). Hence, no procedural due process violation occurred here. A different question might be presented if we were talking about a broad or stigmatizing debarment by the federal government. *See Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643–44 (D.C. Cir. 2003). Here, however, Horsfield's complaint is merely that it is unable to get on one municipality's approved supplier list. This does not implicate a liberty interest.

**C. Horsfield's Open Records Act Claim.** Horsfield also argues the district court erred in finding that Dyersville did not violate Iowa's Open Records Act. That Act provides that "[e]very person shall have the right to examine and copy a public record and to publish or otherwise disseminate a public record or the information contained in a public record." Iowa Code § 22.2.

" 'The purpose of the statute is to open the doors of government to public scrutiny [and] to prevent government from secreting its decision-making activities from the public, on whose behalf it is its duty to act.' " *Diercks*, 806 N.W.2d at 652 (quoting *Rathmann v. Bd. of Dirs.*, 580 N.W.2d 773, 777 (Iowa 1998)). " 'Accordingly, there is a presumption of openness and disclosure under this chapter.' " *Id.* (quoting *Gabrilson v. Flynn*, 554 N.W.2d 267, 271 (Iowa 1996)).

Civil enforcement of Iowa's Open Records Act initially places the burden of showing three things on the party seeking enforcement (Horsfield). That party must "demonstrate[] to the court that the

defendant is subject to the requirements of this chapter, that the records in question are government records, and that the defendant refused to make those government records available for examination and copying by the plaintiff." Iowa Code § 22.10(2). Once a party makes these showings, the defendant has the burden to show compliance, and the court must issue an injunction if it finds the defendant has not complied by a preponderance of the evidence. *Id.* § 22.10(3)(*a*); *see also Diercks*, 806 N.W.2d at 653 ("Once the citizen shows the city denied his or her request to access government records, the burden shifts to the city to demonstrate it complied with the chapter's requirements.").

Horsfield makes two arguments on appeal, both of which relate to the timeliness rather than the completeness of production. First, Horsfield contends the City violated the law by not making its 617-page production until April 2010. This was approximately seventy days after the parties confirmed Horsfield's modified request for these documents and, in Horsfield's view, exceeded the twenty-day deadline set forth in Iowa Code section 22.8(4)(d). Second, Horsfield argues that Dyersville's claim of privilege on certain emails, followed by its belated April 2011 eve-of-trial waiver of that privilege and production of the emails, amounts to an admission that the City had "no defense to its failure to produce relevant and responsive documents."

There is no explicit time deadline in chapter 22 for the production of public records when requested. However, Horsfield argues that there is an implicit time limit of twenty days based on the following language in section 22.8:

> 4. Good-faith, reasonable delay by a lawful custodian in permitting the examination and copying of a government record is not a violation of this chapter if the purpose of the delay is any of the following:

*a.* To seek an injunction under this section.

*b.* To determine whether the lawful custodian is entitled to seek such an injunction or should seek such an injunction.

*c.* To determine whether the government record in question is a public record, or confidential record.

*d.* To determine whether a confidential record should be available for inspection and copying to the person requesting the right to do so. *A reasonable delay for this purpose shall not exceed twenty calendar days and ordinarily should not exceed ten business days.*

*Id.* § 22.8(4)(*a*)–(*d*) (emphasis added). Yet the twenty-day time limit is not a blanket rule; rather, it is limited to the circumstance in which the custodian needs to determine whether an otherwise confidential record should be made available to a person who claims the right to view it. That is not the situation here.

On the other hand, the fact that section 22.8(4) lists certain grounds for "[g]ood faith, reasonable delay" might lead to an inference that those grounds are exclusive. *See Kucera v. Baldazo*, 745 N.W.2d 481, 487 (Iowa 2008) (discussing the rule of *expressio unius est exclusio alterious*). *But see State v. Meyers*, 799 N.W.2d 132, 142 (Iowa 2011) (noting limits on this principle).[4] And section 22.4 of the Open Records Act, by stating that "[t]he rights of persons under this chapter may be exercised at any time during the customary office hours of the lawful custodian of the records," suggests that our legislature contemplated immediate access to public records.

---

[4]One might also argue that because section 22.10(3)(*b*)(2) gives a defense to any person who "[h]ad good reason to believe and in good faith believed facts which, if true, would have indicated compliance with the requirements of this chapter," there should not be an another "good faith" test layered on top of that to determine whether compliance with the Open Records Act has occurred.

Based on our review of section 22.8(4)(*d*), we believe it is not intended to impose an absolute twenty-day deadline on a government entity to find and produce requested public records, no matter how voluminous the request. Rather, it imposes an outside deadline for the government entity to determine "whether a confidential record should be available for inspection and copying to the person requesting the right to do so." We do not think we should extrapolate section 22.8(4)(*d*)'s twenty-day deadline to other contexts, when the legislature chose not even to include that deadline in the other portions of section 22.8(4).

According to a longstanding administrative interpretation of chapter 22:

> Access to an open record shall be provided *promptly* upon request unless the size or nature of the request makes prompt access *infeasible*. If the size or nature of the request for access to an open record requires time for compliance, the custodian shall comply with the request *as soon as feasible*.

*See* Iowa Uniform Rules on Agency Procedure, Fair Information Practices, Agency No.—X.3(17A,22), [hereinafter Fair Information Practices] *available at* https://www.legis.iowa.gov/DOCS/Rules/Current/Uniform Rules.pdf (emphasis added); *see also Griffin Pipe Prods. Co. v. Bd. of Review,* 789 N.W.2d 769, 775 (Iowa 2010) ("Longstanding administrative interpretations are entitled to some weight in statutory construction."). The State's Uniform Rules on Agency Procedure, from which the above quotation is taken, were drafted by a nine-member task force chaired by University of Iowa Law School Professor Arthur Bonfield; they were adopted in 1985. Fair Information Practices at 1. Under this interpretation, practical considerations can enter into the time required for responding to an open records request, including "the size or nature

of the request." But the records must be provided promptly, unless the size or nature of the request makes that infeasible.[5]

In *Wings v. Dunlap*, our court of appeals reversed a district court's determination that a records custodian had violated chapter 22 when it took from March 28, 1991, to April 22, 1991, for him to make certain public records available for examination. 527 N.W.2d 407, 410–11 (Iowa Ct. App. 1994). That court observed, "Chapter 22 cannot be interpreted and applied in a vacuum." *Id.* at 410. That court also held that a "substantial compliance" standard should apply to alleged violations of chapter 22, analogizing to a case where we applied a substantial compliance rule in the context of Iowa's open meetings law, Iowa Code chapter 21. *See id.* (citing *KCOB/KLVN, Inc. v. Jasper Cnty. Bd. of Supervisors,* 473 N.W.2d 171, 176 (Iowa 1991)). The court found substantial compliance notwithstanding the admission by the city attorney that she had "dropped the ball." *Id.* at 409.

In this case we need not decide whether a substantial compliance standard applies to claimed violations of the Open Records Act. The district court followed such a standard and Horsfield does not argue on appeal for something different. In light of this concession, we will utilize substantial compliance here, assuming without deciding that it is the appropriate test. *See Brown v. John Deere Waterloo Tractor Works*, 423 N.W.2d 193, 194 (Iowa 1988) (indicating that substantial compliance is a fact-specific inquiry depending on whether "the purpose of the statute is shown to have been served" (citation and internal quotation marks omitted)).

---

[5]Under federal law, which expressly requires the requested records to be made "promptly available," 5 U.S.C. § 552(a)(3)(A) (2006), it has been considered whether the agency "unreasonably delayed" and whether the requester was "prejudiced" by the delay. *Strout v. U.S. Parole Comm'n*, 40 F.3d 136, 138 (6th Cir. 1994).

Although it is a close question, on our de novo review we are not persuaded that the City's production of the documents requested in January 2010 substantially complied with its legal obligation to produce public records promptly, subject to the size and nature of the request. The City took from approximately January 25, 2010, to April 6, 2010, to produce these 617 pages. The City did not produce any of the documents until after Horsfield went to court on March 18, 2010. A hiatus in communication occurred from February 12, 2010, when Horsfield's attorney asked for a status report, until March 25, 2010, when the City's attorney informed Horsfield's attorney that the records were essentially ready for production, except that the City "had been looking for time to review 42 hours of video."

Most troubling, it appears that the video recordings of public proceedings became a stumbling block to the production of the hard copy documents. That should not have occurred. From the beginning, the City could have offered Horsfield the opportunity to review or copy the video on its own, as it ultimately did. In any event, any issues surrounding the video should not have held up the production of the hardcopy documents once they were located.

The City's position in this case is not without support. The city administrator Michel testified that he had to go through individual employee email accounts. He had to figure out how to get administrative rights and run an appropriate email search. Additionally, "we also had a lot of papers that were not digitized or nonsearchable, so we actually had to go through those documents to make sure that it didn't have those reference points." Michel was dealing with other urgent matters at that time, including the budget, development agreements, the implementation of a loan within a tight time frame, and getting approval for buyouts from

the 2008 floods. This was in addition to his work on regular city business. Michel was devoting fifty to seventy hours a week to his job. Furthermore, none of the 617 pages (nor the video) were actually used at the trial on Horsfield's underlying claim challenging the City's use of preapproved supplier lists.

Still, we have two problems with Michel's testimony. First, his explanations did not include any dates or other time frames. Thus, while he gave plausible explanations for the City's delay that might have carried the day in other circumstances, it is impossible to know how much time it really took city officials to work on Horsfield's request, relative to other demands on city officials' time. The City had the burden of going forward to demonstrate compliance with the Act. *See* Iowa Code § 22.10(2).[6] In addition, as we have already discussed, the handling of the video was unsatisfactory.

We disagree with Horsfield's other contention with respect to claimed violations of the Open Records Act. In our view, the City's tactical decision to waive the attorney–client privilege in April 2011 with respect to the eight emails does not establish that the City violated the Act when it initially withheld them. The Act allows public entities to

---

[6]Under section 22.10(2), once a party seeking judicial enforcement

> demonstrates to the court that the defendant is subject to the requirements of this chapter, that the records in question are government records, and that the defendant refused to make those government records available for examination and copying by the plaintiff, the burden of going forward shall be on the defendant to demonstrate compliance with the requirements of this chapter.

The plaintiff must still prove "by a preponderance of the evidence that a lawful custodian has violated" the Act. *Id.* § 22.10(3). Although section 22.10(2) speaks in terms of a refusal rather than a delay in production, we think a refusal to produce encompasses the situation where, as here, a substantial amount of time has elapsed since the records were requested and the records have not been produced at the time the requesting party files suit under the Act.

withhold "[r]ecords which represent and constitute the work product of an attorney, which are related to litigation or claim made by or against a public body." *Id.* § 22.7(4). Also, the Act does not affect other specific statutory privileges recognized by the legislature, such as the attorney–client privilege. *See Burton v. Univ. of Iowa Hosps. & Clinics*, 566 N.W.2d 182, 186–89 (Iowa 1997); *see also* Iowa Code § 622.10(1). Thus, the City had a right to withhold the emails. While there may be circumstances when it is unfair for a litigant that has properly asserted the attorney–client privilege later to waive that privilege, this is a procedural matter and not a violation of the Open Records Act.

**IV. Conclusion.**

For the foregoing reasons, we affirm the carefully reasoned judgment of the district court in all respects, except we find that the City violated the Open Records Act when it did not produce the public records requested in January 2010 until April 2010. We reverse the judgment on this point only and remand for further proceedings consistent with this opinion.

**DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED.**