*Bitumar USA Inc. v. Vermont Agency of Transp.*, No. 449-7-14 Wncv (Toor, J., July 31, 2014).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
WASHINGTON UNIT
CIVIL DIVISION

| | |
|---|---|
| BITUMAR USA INC.,<br>  Plaintiff<br><br>v.<br><br><br>VERMONT AGENCY OF<br>TRANSPORTATION<br>  Defendant | Docket No. 449-7-14 Wncv |

RULING ON MOTION FOR PRELIMINARY INJUNCTION

Bitumar supplies asphalt cement to paving companies in several states, including Vermont. This case seeks to halt a decision by the Vermont Agency of Transportation (AOT) that would effectively ban Bitumar from doing business with any paving contractors working on State paving projects in Vermont beginning on August 1. A preliminary injunction hearing was held on July 29, at which witnesses testified for both sides.[1]

Findings of Fact

The court finds the following facts to be established by a preponderance of the evidence. Bitumar produces asphalt cement in plants in various states and Canada. Their product contains an ingredient called REOB, which stands for Rerefined Engine Oil Bottoms. It is referred to as a "binder" or a "cutter." The purpose of adding it is to make the asphalt more flexible and thus able to withstand the low winter temperatures in the northeastern states and Canada. REOB is

---

[1] The court received a last-minute filing from AOT as it was about to issue this ruling. The court declines to consider additional evidence that was not admitted at the hearing subject to cross-examination.

refined from recycled engine oil, the term "bottoms" referring to the fact that it is what drops to the bottom of the recycled oils. The upper portions are used for other purposes.

REOB has been used for at least 25 years by Bitumar and others, in the Unites States, Canada, and Europe, although there are other comparable ingredients used by other manufacturers of asphalt cement. Bitumar's product meets all requirements of the American Association of State Highway and Transportation Officials (AASHTO) and meets AOT's requirements for hot and cold temperature responses. Bitumar represents that it is less toxic and more environmentally friendly than other "cutters" used for the same purposes. For example, Bitumar contends that REOB causes less leaching of harmful materials from pavement into surrounding soils.

There is not a lot of research about REOB's long-term impacts. AOT's Section Chief for Materials and Research, William Ahearn, agreed that there is no conclusive evidence about the effect of REOB and that the studies "go both ways." There is some research showing that at concentrations of 10-20% REOB can increase degradation of pavement, but Bitumar uses 8% or less. There is some research showing that at concentrations of 4-6% REOB *improves* durability. One researcher concluded, based on a study of one section of pavement in Ontario, that REOB led to premature cracking of the pavement. Bitumar's chemical engineers strongly disagree with his analysis both because they find his analysis faulty and because he used REOB at 15% and 30% concentrations, which are higher than Bitumar uses. Ontario has continued to use REOB in its roads despite the study, but limits it to a maximum concentration of 8% -- exactly what Bitumar produces. A five-year study in New Zealand showed no difference in aging between REOB and non-REOB pavement.

No other evidence was presented that any research has shown that an 8% or lower mix is problematic in any way. The evidence before the court is that there has also been no research to establish the efficacy of competing "cutter" products. John D'Angelo, a civil engineer that AOT's engineer agreed is one of the primary experts in the asphalt field, states that his testing of REOB in pavement "revealed no adverse effects on the durability of asphalt pavement," and that REOB "has only been shown to improve the performance of asphalt pavement." D'Angelo Declaration ¶ 8. Bitumar has never received any reports that its asphalt products have failed.

Bitumar has sold its product in Vermont for many years. Two of its large clients are Pike Industries and Whitcomb, both of whom have paving contracts with AOT. For 2014, Whitcomb agreed to purchase 100% of its asphalt cement from Bitumar, for a projected $8 million in 2014. Bitumar also currently provides about 65% of Pike's asphalt cement, for a projected $6 million in 2014. Pike has been a client for at least 20 years.

To provide asphalt to paving contractors for use in AOT projects, Bitumar was required by AOT to get its product preapproved. Each year this included sending AOT a quality control report and samples of the asphalt prior to the start of the paving season. Earlier this year AOT received the report and approved Bitumar's samples for 2014.[2]

The paving season is in full swing currently and will continue for the next two or three months. Based upon projections, for the balance of 2014 Bitumar expects to sell approximately another $4 million worth of its product to Pike and another $3 million to Whitcomb.

Over the last nine or so years, AOT road engineers have noticed that the highways in Vermont were showing degradation earlier than expected. They have noted that new asphalt

---

[2] AOT believes Bitumar should have stated that REOB was contained in its product, because AOT considers it a "modifier." The chemical engineers who testified for Bitumar do not define it as a petroleum modifier, but as a "petroleum fraction," and thus Bitumar takes the position that it was not required to list REOB in its disclosures to AOT. None of this is directly relevant to the issue before the court, but it may be that AOT's annoyance at just learning of the ingredient has somewhat colored its decision to ban the product.

pavement will discolor sooner than before, that the tire tracks will begin to show, and that there is more "rattling" and more erosion of loose aggregate with small clumps of asphalt in it. They have been trying to determine the cause of these problems. They recently learned that REOB is being used by pavers and that it is in some of the asphalt that has been used on Vermont roads. Because of the research raising some questions about the impact of REOB on road degradation, AOT and other state transportation engineers for the New England states discussed the issue at a regional meeting in June. The engineers decided to recommend to their agencies that REOB be banned in state road projects until it could be established that it is not contributing to faster road degradation. Ultimately, some of the states issued bans and others, such as Rhode Island, did not. Massachusetts issued a ban but has revoked it pending further study.

The Vermont ban on REOB was announced by letter dated June 12, effective August 1. No public hearings were held, no formal rulemaking took place, and no one was invited to comment or offer any evidence to be considered before the decision was made. The AOT engineer who recommended the ban concluded that because there is not proof that REOB is not causing the degradation, it was in the public interest to avoid it until more is known. AOT weighed the fact that REOB is cheaper than some other options for low-temperature asphalt, and that banning it would increase current costs, but decided that in the end AOT might save money if non-REOB asphalt led to less frequent repaving. AOT is concerned about the cost of repaving roads more often and also the potential danger to drivers from loose materials hitting windshields or hydroplaning from ponding of water in ruts. However, AOT does not know whether there is REOB in the pavement where it has witnessed premature degradation.

Bitumar's asphalt is already mixed and awaiting orders form Pike and Whitcomb. If Bitumar cannot sell its asphalt to them or other pavers contracting with AOT, it will be left with

4

that inventory and no ready buyers. Bitumar cannot redirect it to other areas of the country because the mix is specifically designed for the winter temperatures in this region. Although hard to quantify exactly based upon the current record, Bitumar may well lose millions of dollars even if it can transfer some portion of the product to other customers. The evidence did not establish whether the product could be sold to other New England clients in states such as Massachusetts where REOB is not being banned. Bitumar cannot switch to REOB-free asphalt without expending perhaps seven or eight million dollars to build new equipment, and that would take at least a year and a half even if it has enough land to do so. Bitumar may permanently lose long-term Vermont customers if it is unable to provide the type of asphalt they require.

## Conclusions of Law

The standards for the issuance of a preliminary injunction under Vermont law are not crystal clear. The Supreme Court has said in dicta that courts must consider "(1) the threat of irreparable harm to the movant; (2) the potential harm to the other parties; (3) the likelihood of success on the merits; and (4) the public interest." In re J.G., 160 Vt. 250, 255 n. 2 (1993). Other formulations, such as in the Second Circuit, are somewhat different: "A party seeking a preliminary injunction must show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." Cacchillo v. Insmed, Inc., 638 F.3d 401, 405–06 (2d Cir. 2011).

It is at least clear that the movant must show irreparable harm. Campbell Inns, Inc. v. Banholzer, Turnure & Co., Inc., 148 Vt. 1, 7 (1987). Typically, harm that can be remedied by money damages is insufficient. Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., 596 F.2d 70, 72 (2nd Cir. 1979). However, " [a]n injury is ordinarily understood as irreparable if refusing the

5

injunction would be a denial of justice because redress may not be had through money damages in light of the nature of the act, the circumstances of the person injured, or the financial condition of the person committing the act." 42 Am. Jur. 2d Injunctions § 34.

Here, the evidence is that the impact upon Bitumar would be huge if it suddenly has all of its Vermont-bound inventory with no client to buy it. Bitumar may lose millions of dollars in inventory and potentially long-term clients, as well as being required to expend perhaps seven million dollars to build a new plant over a year and a half to compete for Vermont paving jobs. Bitumar argues, and AOT does not challenge the argument, that because of the State's sovereign immunity Bitumar will have no way of recovering those millions of dollars in financial losses even if it ultimately wins this suit. Thus, the court concludes that Bitumar has established a likelihood of irreparable harm.[3]

The next question is whether Bitumar either has a likelihood of success on the merits or at least has shown sufficient issues making them a fair ground for litigation. This requires analysis of Bitumar's substantive claims.

Bitumar argues that AOT was required to engage in rulemaking here, because the ban is "an agency statement of general applicability which implements, interprets, or prescribes law or policy." AOT argues that when the statute was amended it removed the option of making such an argument, and only allows a party to challenge an existing rule, not argue that a rule was required. The court concludes that it need not resolve this question, because Bitumar's alternative argument decides the motion.

Bitumar's other argument is that it has been denied due process. AOT responds that it may "award contracts on terms as it deems to be in the best interest of the state, for the construction, repair, or maintenance of transportation related facilities." 19 V.S.A. § 10(1);

---

[3] For the same reason, the court finds that Bitumar has standing.

6

<u>Hinesburg Sand & Gravel Co. v. State of Vermont</u>, 166 Vt. 337, 339 (1997). That is all well and good, but it does not insulate AOT from having to follow other legal requirements. If AOT decided to award all its contracts to a company run by the agency head's best friend at a cost double all other proposals, there would surely be some way to challenge that decision despite the statutory language cited.

Nor does <u>Hinesburg Sand & Gravel</u> control here. In that case, the Court was assessing a claim by a gravel supplier that hoped to get future subcontracts from contractors of the State. *See also*, <u>Horsfield Materials, Inc. v. City of Dyersville</u>, 834 N.W.2d 444, 459 (Iowa 2013)(supplier of aggregate and concrete who was not placed on preapproved materials supplier list had "merely an unfulfilled desire to enter into contracts to supply materials for Dyersville public improvements."). Here, AOT *expressly approved the asphalt samples sent to it by Bitumar for use in 2014*, as well as Bitumar's quality control plan for 2014. The June letter effectively revokes that approval of Bitumar's product without any hearing or process whatsoever. This case therefore differs from those cited by AOT because here Bitumar had more than a mere hope of future business. It arguably had a property interest based upon AOT's approval of its product. Even an informal understanding may be sufficient. <u>Brennan v. Town of Colchester</u>, 169 Vt. 175, 179 (1999).

This case is more akin to <u>Toxco Inc. v. Chu</u>, 724 F.Supp.2d 16 (D.D.C. 2010). In <u>Chu</u>, the plaintiff was a subcontractor working on cleanup of a toxic waste site for the Department of Energy (DOE). DOE required subcontractors to be pre-approved, and had granted such approval to the subcontract with plaintiff Toxco. Toxco began to do the work, and eight days later DOE rescinded its approval. Toxco sued. As here, the government argued that "DOE's decision to withdraw its consent was a matter committed to agency discretion by law," and argued that there

was no property right subject to due process. Id. at 20. The court rejected those claims, holding that a subcontract with a government contractor can create a property interest triggering due process protections. Id. at 27, and cases cited therein. As another court has noted, "[w]here the independent source of a property interest is a private contract, the state cannot transgress on the claim of entitlement to continued [business] without due process of law." Stein v. Board of City of New York, Bureau of Pupil Transp., 792 F.2d 13, 16 (2d Cir. 1986)(bus driver lost job with bus company because of Board of Education's revocation of his driving certification). *See also*, Baja Contractors, Inc. v. City of Chicago, 830 F. 2d 667, 675-77 (7th Cir. 1987)(concrete supplier had 'likelihood of showing a protected property interest" because City had granted contractor certification and then withdrawn it).

Bitumar may well be able to show at trial that it reasonably relied upon AOT's pre-approval in manufacturing a certain amount of its product specifically for Vermont highway projects, that it has a property interest in its contracts with Pike and Whitcomb, and that it is entitled to due process before AOT causes the termination of those contracts. The court concludes that Bitumar is likely to succeed at trial on its claim that once AOT has approved a specific product for a specific paving year it cannot unceremoniously change its mind without providing any process at all to the manufacturer of the approved product.

With regard to balancing the equities, the court sees the impact upon Bitumar as far outweighing the public interest that would be served by the REOB ban. This is because the injury to Bitumar is substantial and the evidence to support the ban is exceedingly weak. AOT made the decision with no evidence at all that REOB is actually the culprit in the road degradation it has observed. Not only is there little research suggesting that REOB at low concentrations causes any problems, but AOT has no idea whether there is any REOB in the

specific areas of pavement in which it has seen degradation. While the court understands the AOT engineer's view that it is better to be safe than sorry, and that might perhaps be sufficient in deciding how to proceed in future years, his determination here was based on little more than speculation. There is just not sufficient evidence to suggest that the public interest is being protected by the REOB ban.

Order

The court grants a preliminary injunction in Bitumar's favor pursuant to V.R.C.P. 65. AOT is ordered to suspend its ban on REOB in state paving projects until further order of the court. AOT has not requested the posting of security and the court sees no basis to require any.

The court urges the parties to discuss a negotiated resolution that will address the concerns of both sides. AOT shall file its answer to the complaint by August 20 and the parties shall file a discovery schedule by September 2.

Dated at Montpelier this 31st day of July, 2014.

_____
Helen M. Toor
Superior Court Judge