**IN THE COURT OF APPEALS OF IOWA**

No. 22-1966
Filed March 29, 2023

**IN THE INTEREST OF R.D. and A.D.,**
**Minor Children,**

**M.D., Father of R.D.,**
        Appellant,

**N.W., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Kimberly Ayotte,

District Associate Judge.


        The mother of two children and the biological father of one of those children

separately appeal the respective termination of their parental rights.  **AFFIRMED**

**ON MOTHER'S APPEAL; REVERSED AND REMANDED ON FATHER'S**

**APPEAL.**


        Brooke J. Thompson of Miller, Zimmerman & Evans, PLC, Des Moines, for

appellant father.

        Andrea B. McGinn of Skogerson McGinn L.L.C., Van Meter, for appellant

mother.

        Brenna Bird, Attorney General, and Diane Murphy Smith, Assistant Attorney

General, for appellee State.

Jami J. Hagemeier of Youth Law Center, Des Moines, attorney and guardian ad litem for minor children.


Considered by Vaitheswaran, P.J., and Greer and Chicchelly, JJ.

**GREER, Judge.**

The mother of R.D. (born in 2014) and A.D. (born in 2018) and the father of R.D. separately appeal the termination of their parental rights to their respective children.[1] The juvenile court terminated each parent's rights under Iowa Code section 232.116(1)(f) (2022). The mother and father each challenge whether the State proved the statutory ground for termination, argue the loss of their rights is not in the best interests of their child or children, and maintain the State failed to make reasonable efforts at reunification. As part of their reasonable-efforts challenge, the mother and father challenge the constitutionality of Iowa Code section 232.102A(2) (Supp. 2022), which provides, "Family interactions shall continue regardless of a parent's failure to comply with the requirements of a court order or the department, provided there is no finding by a court or the department that such interaction would be detrimental to the child." They allege the statute violates procedural and substantive Due Process and they each challenge it both facially and as applied.[2] Finally, in the alternative, the father asks us to give him more time to work toward reunification.

**I. Background Facts and Proceedings.**

R.D. and A.D. were removed from the mother's care in June 2019 after what is now the Iowa Department of Health and Human Services learned she parented the children after using methamphetamine. At the request of the department, the

---

[1] For simplicity, we refer to R.D.'s father as "the father" going forward.
[2] The mother and father raised these issues in their respective petitions on appeal. Then we ordered further briefing "on the issue of the constitutionality of Iowa Code section 232.102A(2) (Supp. 2022) and the possible violation of the parents' constitutional rights." The mother, father, and State all complied.

father provided a drug screen that was negative for illegal substances. Believing he was the biological father of both R.D. and A.D., the children were placed with the father under the department's supervision.

Then in August, the State petitioned to modify placement, explaining that the father pled guilty to driving while barred and, after failing to report for sentencing, had an active warrant out for his arrest. The juvenile court granted the motion, and the children were removed from the father's care on August 2. But later the same month, the father asked the court to return the children to him. While he was sentenced to a term of incarceration not to exceed two years, he posted an appeal bond and was living in his home during the pendency of his criminal appeal. The department did not resist the father's motion, and R.D. and A.D. were returned to his care and custody on August 30.

Eventually, DNA testing showed the father was not the biological parent of A.D. He petitioned to intervene in A.D.'s child-welfare case and met no resistance. Both children remained in his care, and the father expressed an intention to adopt A.D. if the children were not reunified with the mother.

In June 2020, a year after the children's removal from the mother's care, the juvenile court entered a permanency order, in which it found that the mother was not making reasonable progress toward reunification and stated:

> The mother is not fully honest regarding her addiction, she has not demonstrated a commitment to sobriety, and needs to fully and honestly engage in treatment. She stands in the same place as she did at the outset of the case. Based on the mother's current progress, reunification is not likely to occur within 6 months.

The juvenile court transferred sole custody of R.D. to the father, *see* Iowa Code § 232.104(2)(d)(2) (2020), and transferred guardianship and custody of A.D. to the

father, *see id.* § 232.104(2)(d)(1).  As of this point, the permanency goal was no longer to reunify the children with the mother.

The children remained in the father's care until the State moved to modify placement in August 2021—a period of about two years.  The State asserted that, since the children were placed in his care, the father pled guilty to theft in the fifth degree and trespass and also still had pending theft charges in cases from April and June 2021.  Additionally, the father lost his criminal appeal and would be required to serve his prison sentence for driving while barred.  The department was concerned the father had a paramour whom he was allowing to supervise the children, in spite of the paramour's use of illegal substances and her own involvement with the juvenile court surrounding the removal of her children due to substance abuse.  Both the mother and father resisted the motion, but the court granted it, concluding out-of-home placement was necessary for R.D. and A.D. because of "the mother's unresolved substance abuse and the father's lack of protective capacity and ongoing criminal matters which [were] likely to bring about his incarceration."  The department was given legal custody of the children for purposes of placing them in foster care.

The father began serving his prison sentence in November 2021.

In December, the mother moved "for reasonable efforts and visitation."  In her written motion, she recognized the department did not have an obligation to make efforts aimed at reunifying her with the children as the child-welfare cases were "post permanency" in regard to her.  Still, the court ordered the department to "continue to explore additional ways that visitation [could] be facilitated."  The

court also granted the father's request for prison visitation "at the discretion of the [department]."

Following a March 2022 permanency hearing, the court confirmed that the permanency goal was for A.D. and R.D. to be returned to the care of the father.

Other than a brief stint outside of custody, the father remained incarcerated until June 30, 2022.[3] He had no in-person visits with the children during his incarceration. Upon his release, the father questioned the department's decision to limit his interactions with the children to written letters, which the children could process with their therapist. He moved for reasonable efforts, requesting "that, at a minimum, supervised visitations and therapeutic visitations occur with the children." In doing so, he relied on the previous statute, Iowa Code section 232.107 (2022), and argued that the department had to provide reasonable efforts toward reunification, including visitations, "absent a showing that the child's life or health would be in imminent danger."

In a July 21 order, the juvenile court found the department was making reasonable efforts, stating:

> On March 29, 2022, this court entered a Review and Permanency Review Order that found that [the department] had made reasonable efforts. The father was incarcerated at the time of the hearing and had indicated that his release date would be several months. The court ordered [the department] to explore in-person visits with the father. Throughout his stay in prison, [the father] was able to have phone contact with the children. [He] was released from prison on April 15, 2022, much earlier than anticipated. [The department] arranged for in-person visits to begin. Before a visit could happen, [the father] was arrested again on April 20, 2022. He remained in

_____

[3] The father was in prison serving his sentence on the driving-while-barred conviction from November 2021 to April 2022. He was released from prison and then arrested only a few days later for driving a vehicle without the owner's consent. He remained in county jail on that charge until June 30, 2022.

Polk County Jail until June 30, 2022. [He] was not able to have in-person contact with the girls while in jail. [He] was able to call and text the girls. [R.D.] is resistive to visit with her parents. The children's therapist recommended that the father write letters in lieu of face-to-face visits. [The father] did not send any letters until he was discharged from jail. [He] had money to make phone calls to his children but argued that he did not have the 80 cents necessary to purchase an envelope while in jail. *The children's therapist indicated on July 11, 2022 that the children were ready for in-person interactions. Visits are expected to resume.* The court finds that reasonable efforts were provided by [the department] in the form of visitation.

(Emphasis added).

In the same order, the court denied both the mother's and father's request for a six-month extension; it modified the permanency goal for the children to termination of both parents' parental rights. In denying the father's request, the court found additional time was not in R.D.'s best interests, stating:

[R.D.] has shared with her guardian ad litem [(GAL)], her therapist, and this court that she does not want to return home to her father's care. She feels safe and secure where she is at. She has her emotional, physical, and mental health needs met. She has waited since 2019 for a parent to provide that stability she is now receiving. It is not fair to make her continue to wait for permanency.

Less than a week later, the father filed another motion for reasonable efforts. The father explained that he received an email from the department telling him visits would not take place. The email referenced a letter from R.D.'s therapist, who stated R.D. had "been very clear [in therapy] regarding her desires and her concerns. She has shared explicitly that she does not want to have visitation with her father." The therapist opined:

[R.D.] should be able to have choice in participating in visitation in order to ensure her comfort level and reduce potential triggers. [She] has a history of parentification and trauma and moving forward with visitation without considering her wants and

needs could lead to increased behavioral and emotional responses and difficulty regulating physically and emotionally.

Again, relying on the former statute, the father argued the therapist's opinion that visits "could lead to increased behavioral and emotional responses and difficulty regulating physically and emotionally" did not meet the standard to cease visits—that "supervised visitation would cause an imminent risk to the child's life or health." Iowa Code § 232.107 (2022). Following the father's lead, the mother also filed a motion for reasonable efforts relying on the old statute, asking for her weekly visits with the children to resume.

The State resisted, pointing out that section 232.107 was repealed effective July 1, 2022. Section 232.102A(2) (Supp. 2022) now governed family interactions; it provided, "Family interactions shall continue regardless of a parent's failure to comply with the requirements of a court order or the department, provided there is no finding by a court or the department that such interaction would be detrimental to the child." The State asserted that the department "consulted with the children's therapist and [came] to the conclusion that the initiation of family interactions with [the father] at this time would be detrimental to the children" and that it would "continue to work with the children's therapist to assess when it is in the children's best interests to offer visitation." For similar reasons, the State also resisted the mother's motion.

In an amended motion, the mother cited to section 232.102A(2) for her request for reasonable efforts in the form of weekly visits. She argued:

> Visitation is one of the most important elements in reunification of parents with their children. There has been no finding made by this Court that visits between the mother and the children would be detrimental to the children. No such evidence has been

presented to the court, nor has an order denying [the mother's] visitation been entered.

> The GAL has voiced that the children do not desire to have visits with the mother at this time. The children's preference is not dispositive of this issue. Given their ages, visitation should continue.

Following a hearing on the motions on August 23, the court denied the parents' requests for visits, ruling:

> The GAL Report to the Court notes that [R.D.] has had increased anxiety since a visit with her mother [in late July]. [R.D.] has told [the department], [the court appointed special advocate (CASA)], her therapist, her GAL, and this Court that she does not want visits with her parents. [A.D.] has also shared that she does not want to attend visit with her mother.
>
> The therapist reports that [R.D.] is attending visits with her mother to "protect [A.D.]." [R.D.] has feelings of sadness and anger related to visits. [R.D.'s] therapist recommends that [R.D.] have a choice in participating in visits to ensure her comfort level and to reduce potential triggers due to [R.D.'s] history of parentification and trauma. Her therapist warns that moving forward with visits could lead to increased behavioral and emotional responses and difficulty regulating physically and emotionally.
>
> Although the therapist recommends suspending visits, the therapist intends to be[gin] [eye movement desensitization and reprocessing therapy] work with [R.D.] to increase positive feelings towards the parents so that visits can resume.
>
> The court finds based on the children's history of trauma and [R.D.] history of parentification, the children's stated position, [R.D.] feelings of sadness and anger related to visits, the potential for increased behavioral and emotional responses, and the potential for difficult regulating physically and emotionally if visits occur, that family interactions are detrimental to the children.
>
> DHS has made reasonable efforts to achieve the permanency goal.

Meanwhile, the State filed petitions to terminate the mother's and father's parental rights on August 2; the trial took place over three days: September 8, October 5, and October 26, 2022.

Following trial, the juvenile court terminated the mother's rights to R.D. and A.D. and the father's rights to R.D. under section 232.116(1)(f). The court explicitly

recognized the mother raised the issue of substantive due process in regard to the department's decision to cease visits and denied it; the court also seemed to deny a procedural due process claim.

The father asked the court to reconsider, enlarge, or amend its ruling, *see* Iowa R. Civ. P. 1.904(2), noting he also raised a due process challenge to the decision to cease visits pursuant to section 232.102A(2) but this was not mentioned in the court's ruling. Additionally, he asked the court to make an explicit ruling on his request for additional time to work toward reunification. *See* Iowa Code § 232.104(2)(b). In response, the court filed an order denying the father's due process claims for the same reasons as the court denied the mother's. It also denied the father's request for additional time.

The mother also filed a rule 1.904(2) motion; she asked the court to reconsider termination under section 232.116(1)(f). The juvenile court filed an order with extensive findings explaining its ruling and confirmed that termination of the mother's rights was in the children's best interests.

The mother and father separately appeal.

## II. Standard and Scope of Review.

Because "each parent's parental rights are separate adjudications, both factually and legally," we consider each appeal separately. *In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020). We review both the termination of parental rights and constitutional issues de novo. *In re T.S.*, 868 N.W.2d 425, 431 (Iowa 2015) (termination); *Bowers v. Polk Cnty. Bd. of Supervisors*, 638 N.W.2d 682, 688 (Iowa 2002) (due process).

**III. Mother's Appeal.**

  **A. Due Process.**

  The mother argues, "The State failed to [make] reasonable efforts to achieve permanency for the children in part by denying the interactions between the mother and the child[ren]." As part of that argument, she challenges the constitutionality of Iowa Code section 232.102A(2), contending that ending family interactions when either the department or the court makes a finding "that such interaction would be detrimental to the child" violates due process. But because we conclude the statute is not applicable to the mother, she lacks standing to challenge it.[4]

  Generally, the department has an obligation to make reasonable efforts and provide services. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("[Under federal legislation] the concept of family preservation was established with a goal of reuniting children with their families after reasonable efforts by social services. Congress mandated services for families and children under the threat of ineligibility for federal matching funds to accomplish this goal."). Historically, the reasonable-efforts mandate was focused solely on family preservation. *See id.* ("The reasonableness effort was conceived by Congress in part to ensure that prior to the expenditure of federal funds on foster care, reasonable efforts would be made to prevent out-of-home placement, and reasonable efforts would be made

---

[4] The State did not raise this issue; "[i]t is clear, however, that a court may raise the issue of standing sua sponte." *In re C.S.*, Nos. 06-0381, 06-0264, 2006 WL 1628192, at *3 (Iowa Ct. App. June 14, 2006); *see also Reiff v. Evans*, 630 N.W.2d 278, 285 (Iowa 2001) ("[I]f our court felt we lacked jurisdiction because of standing, we could have raised that on our own motion, even if it was not an issue before us.").

for unification following out-of-home placement."). But in the late 1990s, that changed. *See id.* (recognizing "the reasonable efforts requirement has undergone some transformation" because "the family preservation concept. . . was found to be detrimental to children in some cases"); *In re L.T.*, 924 N.W.2d 521, 529 (Iowa 2019) ("[B]efore 1997, Iowa's child welfare laws focused on reuniting the family unit. In the late 1990s, however, the focus in termination cases shifted from reunification of the family to the child's best interests." (internal citation omitted)). Now, the driving force behind "reasonable efforts" is the best interests of the child. *See L.T.*, 924 N.W.2d at 529.

That said, the efforts made and services offered by the department are still often aimed at preventing a child's removal or reunifying a family. But in cases where it is not appropriate or possible to return a child to a parent, the focus of the department's efforts is on permanency for the child rather than services meant to aid in reunification of the family. *See* Iowa Code § 232.102A(1) ("If returning the child to the family's home is not appropriate or not possible, reasonable efforts shall include the efforts made in a timely manner to finalize a permanency plan for the child. A child's health and safety shall be the paramount concern in making reasonable efforts."); *L.T.*, 924 N.W.2d at 529 (recognizing the Code "provides for situations in which reunification need not be a goal or component of [the department's] reasonable efforts").

The mother's case is one such case. In the June 2020 permanency order— a year after the children were removed from the mother's custody—the juvenile court determined it was not possible to return the children to the mother; it then determined reunification with the mother was no longer the permanency goal and,

accordingly, transferred sole legal custody of R.D. to the father and gave the father sole legal guardianship and custody of A.D., *see* Iowa Code § 232.104(2)(d)(1), (2). Since that time, the permanency goal, as established by the juvenile court, has never reverted back to reunification with the mother. So, from that point, the department no longer had an obligation to make reasonable efforts toward or provide services aimed at reunifying the children with the mother. *See L.T.*, 924 N.W.2d at 528 ("Where it is inappropriate to return a child to the family home, the legislature specified that 'reasonable efforts shall include the efforts made in a timely manner to finalize a permanency plan for the child.'" (citation omitted)).

Visitation, or "family interactions," are a reunification service. *See In re M.B.*, 553 N.W.2d 343, 345 (Iowa 1996) ("Visitation between a parent and a child is an important ingredient to the goal of reunification."); *see also C.B.*, 611 N.W.2d at 493 (describing Iowa's "scheme of reasonable efforts" to "cover both the efforts to prevent and eliminate the need for removal," which includes "visitation designed to facilitate reunification"). So, the department, which was off the hook for reunification services, was no longer required to provide visits to the mother. And that means section 232.102A(2), which governs family interactions under the umbrella of reasonable efforts, is not applicable to the mother. So, the mother lacks standing to challenge the statute. *See Godfrey v. State*, 752 N.W.2d 413, 418 (Iowa 2008) (requiring a litigant to "(1) have a specific personal or legal interest in the litigation and (2) be injuriously affected" to have standing to challenge a statute); *cf. McQuistion v. City of Clinton*, 872 N.W.2d 817, 833 (Iowa 2015) (requiring the party asserting a substantive due process claim to "establish that the

fundamental right asserted . . . has been implicated by the particular government action at issue").

We do not consider the merits of the mother's constitutional claims. *See Horsfield Materials, Inc. v. City of Dyersville*, 834 N.W.2d 444, 452 (Iowa 2013) ("This [standing] inquiry is separate from, and precedes, the merits of a case."); *Alons v. Iowa Dist. Ct.*, 698 N.W.2d 858, 864 (Iowa 2005) ("Even if the claim could be meritorious, the court will not hear the claim if the party bringing it lacks standing."). We move on to the mother's challenge to the termination of her parental rights.

**B. Termination of Parental Rights.**

The mother challenges the termination of her parental rights, arguing the State failed to prove the ground for termination and the loss of her rights is not in the children's best interests.

For the court to properly terminate under section 232.116)(1)(f), the State had to prove several elements not at issue here and that the children could not be returned to the mother's custody at the time of the termination trial. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting "at the present time" in section 232.116(1)(h)(4) as "at the time of the termination hearing"). The mother asserts the children could be returned to her care because she had stable housing, was employed, and—as she puts it—had not shown "any behavioral indicators of [methamphetamine] use . . . since February 2022."

The children were removed from the mother's care in June 2019 due to the mother's use of methamphetamine, and her issues with the drug persisted. The mother tested positive for methamphetamine in February, April, and June 2022.

She disputed the accuracy of those results, but her lack of honesty about her substance abuse has long been an issue in this case; we credit the test results over her testimony. Like the juvenile court, we conclude the mother's continued use of methamphetamine prevents her from being a safe caretaker. *See State v. Petithory*, 702 N.W.2d 854, 859 (Iowa 2005) ("No parent should leave . . . small children in the care of a meth addict—the hazards are too great."). So, the children could not be returned to her care. *See In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992) ("[A] child cannot be returned to the custody of the child's parent under section 232.102 if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication."); *see also In re J.S.*, 846 N.W.2d 36, 37 (Iowa 2014) (holding that it is reasonable for the court to conclude a parent's active addiction to methamphetamine amounted to an adjudicatory harm).

Next, the mother argues termination of her parental rights is not in the children's best interests. We are "required to use the best-interest framework established in section 232.116(2) when [we] decide what is in the best interest of the child[ren]." *In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). We "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). At the time of the termination trial, the children had been removed from the mother's care for more than three years. More than two years had lapsed since the permanency goal was changed from reunification with the mother, and the mother spent limited time with the children in the years following that change. And, at the time of the termination trial in late 2022, the mother was still not able to be the full-time

caregiver to these children. Termination of the mother's rights is in R.D.'s and A.D.'s best interests. *See In re J.E.*, 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially) ("A child's safety and the need for a permanent home are now the primary concerns when determining a child's best interests.").

**IV. Father's Appeal.**

**A. Termination of Parental Rights.**

The juvenile court terminated the father's parental rights to R.D. under Iowa Code section 232.116(1)(f), which requires the State to prove the following:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

This statutory ground includes a reasonable-efforts requirement. *See C.B.*, 611 N.W.2d at 492 (recognizing that the element requiring "the State [to] show the child cannot be returned to the custody of the parent" "implicates the reasonable efforts requirement"). Which means "[t]he State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." *Id.* at 493. "[O]ne of the primary reunification services [is] visitation with the child[]." *In re C.H.,* No.18-1828, 2019 WL 325864, at *2 (Iowa Ct. App. Jan. 23, 2019).

In our review of the efforts made by the department and the services offered, we focus specifically on the period from August 26, 2021—the point when the children were removed from the father's care—up until the father was released

from jail on June 30, 2022, at which point section 232.102A(2) had yet to take effect. *See* 2022 Iowa Acts ch. 1098, § 49; *see also* Iowa Code § 3.7(1) ("All Acts and resolutions of a public nature passed at regular sessions of the general assembly shall take effect on the first day of July following their passage, unless some other specified time is provided in an Act or resolution."). During this time period, the permanency goal was to reunite R.D. with the father,[5] and the department had an obligation to provide reunification services. *See* Iowa Code § 232.102(4)(b) ("If the department transfers custody of the child . . . , reasonable efforts shall be made to make it possible for the child to safely return to the family's home.").

As previously stated, visitation is a reunification service under the umbrella of reasonable efforts. *See In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) ("The reasonable efforts concept would broadly include a visitation arrangement designed to facilitate reunification while protecting the child from the harm responsible for removal." (citation omitted)). And the father's incarceration did not relieve the department of its obligation to make reasonable efforts aimed at reunification. *See In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000) ("Although we agree a parent's imprisonment may create difficulties in providing reunification services, we are not convinced imprisonment absolves the department of its statutory mandate to provide reunification services under all circumstances."). In

---

[5] Technically, the goal at that time was for both R.D. and A.D. to be returned to the father's care. But the father only has parental rights to R.D., so she is the only child at issue during our review of whether termination was proper.

fact, we have articulated factors the department may consider *when deciding* if visitation with an incarcerated parent is reasonable, including:

> the age of the children, the bonding the children have or do not have with their parent, including any existing clinical or other recommendations concerning visitation, the nature of parenting deficiencies, the physical location of the child and the parent, the limitations of the place of confinement, the services available in the prison setting, the nature of the offense, and the length of the parent's sentence.

*Id.; see also In re R.C.,* No. 16-1131, 2016 WL 4803919, at *5 (Iowa Ct. App. Sept. 14, 2016) (noting the department's requirement to make a record concerning its consideration of these factors).

Here, we find no documentation of the department's considerations in the record. It is undisputed the father had no in-person visits with R.D. while he was incarcerated from November 2021 to June 2022. The father's only contact with R.D. was by way of phone. And that contact was only achieved because the father used his funds to make phone calls from the prison to the foster parents directly; if they were able to answer and R.D. was nearby and available, the father got to communicate with her. The department did nothing to facilitate the contact—it did not help set a schedule, provide a person to supervise, or provide the means for the contact to be made. At the termination trial, the father's attorney elicited the following testimony from the social worker on cross-examination:

> Q. And the children were in [the father's] care until August of 2021 if I remember correctly, right? A. Yes.
> Q. After that removal, did [he] get any visits with the children? A. Yes.
> Q. What did those visits look like? A. I believe he was given two visits a week supervised by [a family centered services (FCS) worker] either at his home or in the community. I also helped supervise visits.

Q. Do you recall if [the father] could have the foster parents supervise as well?  A. Yes.

Q. So at that point was he having regular contact with the children?  A. Yes.

Q. And he first went to Jasper County Jail while waiting transport to the Iowa Medical Classification Center.  Does that sound right?  A. Yes.

Q. As far as visits while he was in Jasper County Jail, what did those look like?  A. He had phone calls with the children.

Q. Were those FCS facilitated?  A. No.  He called the foster parents directly.

Q. Could he also have video contact with them?  A. That was approved.  I don't know if that occurred.

Q. And those visits were entirely up to [the father] and the foster parents to coordinate; is that right?  A. Yes.

Q. Do you know if it's an option that FCS could have facilitated those in a more regular fashion? A. They could have, but there was no barriers to [the father] calling the foster parents directly that I was aware of.

Q. You would agree with me that generally incarcerated persons have to have funds on their books to make phone calls; is that correct?  A. Yes.

. . . .

Q. When [the father] was eventually moved to the Newton Correctional Facility, were visits explored there either in person or facilitated by FCS?  A. I sent the application to both FCS and the foster parents so that they could fill it out and provide it to a facility to be approved for both in person and phone contact.  The foster parents filled it out expeditiously and returned it.  And phone contact was initiated between Dad and the children through the foster parents.

Q. To your knowledge, did FCS ever fill out that paperwork?  A. I'm not aware that they did.

Q. So it was, again, up to [the father] and the foster parents to facilitate any contact?  A. Correct.  I followed up with FCS on at least two occasions.  And, again, I'm not aware that they did fill it out, but Dad was having contact with the children through the foster father.

Q. How often was he having contact?  A. Not regularly.  I think—I can't say for certain.  I think it was pretty minimally.

Q. Are you aware of why those visits were minimal at best, to your phrasing?  A. No.

Q. Did you inquire?  A. No. . . .

Q.  . . .To your knowledge, were in-person visits while he was in Newton ever explored?  A. No.

Q. Why not?   A. The foster parents had talked about potentially taking the children up there, but they didn't have a chance to, to my understanding.

Q. But it's your understanding they were approved for in-person visits, correct? A. That's my understanding.

Q. And subsequently in the Polk County Jail, I believe, in-person visits are not allowed; is that correct? A. They're not allowed, correct.

Q. Were video visits ever explored? A. Video visits are allowed at the Polk County Jail, yes.

Q. To your knowledge, were they ever explored by the foster parents, yourself, or FCS? A. I don't recall. I believe at that time we were asking him to write letters.

Q. Do you remember when the decision was made for letters to be commenced? A. I'd have to look back at the E-mails with the therapist, but it was while he was incarcerated at the Polk County Jail that it was recommended that he start writing letters to the children.

Q. And when did you personally communicate that information to him? A. When I went to visit him at the jail. Again, I'd have to look at my notes to get the date. I know that I had communicated that to you approximately a month before I went to visit him at the jail.

Q. And I believe my response to you was that I would send him a letter informing him. Does that sound right? A. Yes, but then he stated that he didn't receive that letter.

Q. So the first time he would have learned about writing letters, then, was your visit, I want to say, in June [2022]? A. Yes, that sounds correct.

Permitting the father to attempt to make contact with his child is not the same thing as providing visits to facilitate reunification; the reasonable-efforts mandate requires more of the department than just getting out of the incarcerated parent's way. *See In re T.A.*, No. 03-0452, 2003 WL 21459553, at *4–5 (Iowa Ct. App. June 25, 2003) (finding the department failed to make reasonable efforts when it failed to provide "[t]he key service" an incarcerated parent "required to facilitate reunification with her children," which was visitation). "To establish reasonable efforts, the [department] must either present a definitive plan with the ultimate goal of visitation or make a showing that visitation is not in the children's best interests." *In re S.P.*, No. 16-1919, 2017 WL 108798, at *5 (Iowa Ct. App. Jan. 11, 2017).

One last observation—after the father was released from jail, the children's therapist notified the department and the father on July 11, 2022, that the children were "open" to visitation, but fifteen days later that effort was blocked because of the eight-year-old child's change in desire to see her father. We have no explanation for why fifteen days earlier visitations with the father were not "detrimental" but then were, except that the child no longer wanted to attend. Certainly, a child's feelings about visitation should be considered, but conditioning visitations on the child's wishes places unwarranted pressure that could be detrimental to the child in and of itself. This is concerning as the department faulted the father for placing the child in an adult role, yet at the termination trial, the child's counselor said:

> So I think my biggest concern in terms of contact is that it feels safe. I am not in a position to determine whether contact should or should not happen. What I have encouraged is that there be a voice given to specifically [the child] and that she be able to make that decision based on her own comfort level while we were simultaneously processing her past experiences with the goal that that would then help her to reframe some of those negative associations and memories that she had related to her parents and hopefully provide some space for her to have a more positive outlook on her parents.

We conclude the department failed to meet its obligation of reasonable efforts as it pertains to the father. So, the State failed to prove the statutory ground for termination, and the termination of the father's rights cannot stand. *See In re L.F.*, No. 22-1173, 2022 WL 4362191, at *4 (Iowa Ct. App. Sept. 21, 2022). We reverse the termination of the father's parental rights to R.D. and remand for further proceedings. *See id.*

In the same vein, we conclude continuation of the child's placement for an additional six months is appropriate. *See* Iowa Code § 232.104(2)(b); *see also*

*R.C.*, 2016 WL 4803919, at *1–2 (rejecting State's contention six months of services would not lead to successful reunification of father and daughter after State failed to provide an incarcerated parent visitation with his child and failed reasonable-efforts mandate). So, we grant the father's request for six months of additional time to work toward reunification with R.D. *See id.* at *5 (recognizing that time is a critical element in child-welfare cases but granting additional time when the court could not "yet say [the child] faces greater harm in delaying permanency that being permanently separated from her father"). A.D. should also be included in reunification services. *See, e.g.*, *In re A.M.S.*, 419 N.W.2d 723, 734 (Iowa 1988) ("[S]iblings should not be separated without good cause and compelling reasons.").

Because we resolve the issues on the statutory grounds, we do not reach the father's constitutional arguments. *See In re S.P.*, No. 03-0868, 2003 WL 22092477, at *2 (Iowa Ct. App. Sept. 10, 2003), *affirmed by In re S.P.*, 672 N.W.2d 842, 846 (Iowa 2003) ("The court of appeals did not reach the constitutional issues [the father] raised because the court decided the case in his favor on the basis of statutory law. . . . Because we reach the same result as the court of appeals, we likewise confine our analysis to Iowa statutory law.").

**V. Conclusion.**

The mother lacks standing to challenge the constitutionality of section 232.102A(2), so we do not consider her constitutional claims. After reviewing the termination proceedings, we affirm the termination of the mother's parental rights to R.D. and A.D. As to the father, we conclude the department failed to meet its reasonable-efforts obligation; we reverse the termination of the father's rights to

R.D., grant his request to delay permanency for six months, and remand. We do not reach the father's constitutional arguments.

**AFFIRMED ON MOTHER'S APPEAL; REVERSED AND REMANDED ON FATHER'S APPEAL.**